**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| **JOHN CHAMBLEE,** *et al.*,<br><br>Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>**TERRAFORM POWER, INC.,** *et al.*,<br><br>Defendants. | **No. PX 16-981**<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Clemens Schlettwein and Jerome Spindler and Plaintiff John Chamblee (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TerraForm Power, Inc. ("TerraForm" or the "Company"), SunEdison, Inc. ("SunEdison"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired TerraForm securities between July 18, 2014 and March 15, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against TerraForm and certain former directors and senior executive officers of the Company.

2. TerraForm, headquartered in Bethesda, Maryland, was formed by its controlling shareholder, SunEdison, to own and operate solar and wind generation assets acquired or "dropped down" primarily from SunEdison, but also from unaffiliated third parties. TerraForm's first day of trading after its initial public offering ("IPO") was July 18, 2014. As of February 20, 2015, its portfolio consisted of solar and wind projects located in the United States, Canada, the United Kingdom, and Chile.

3. During the Class Period, the Company did not have any employees. SunEdison provided TerraForm with managerial and administrative services, including accounting, audit, information technology, financial back-office and cash-management functions pursuant to a Management Services Agreement between the Company and SunEdison ("Management Services Agreement").

4. Additionally, throughout the Class Period, Terraform shared significant overlapping management and Board members with SunEdison (and SunEdison's other affiliates.) TerraForm management was controlled by, and beholden to, SunEdison. Management services were provided to the Company in accordance with the Management

Services Agreement and SunEdison determined and paid Terraform management's compensation.

5. Through its stock ownership, Board and managerial control, and TerraForm's reliance on SunEdison for drop down acquisitions and essential services under the Management Services Agreement, SunEdison exercised unfettered control over the business and affairs of TerraForm (except for the authority delegated to the Corporate Governance and Conflicts Committee of TerraForm's Board of Directors to review and authorize related-party transactions).

6. Throughout the Class Period, defendants made materially false and/or misleading statements and/or omitted to state material facts that they knew or recklessly disregarded. Specifically: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

7. When the truth was disclosed on November 9, 2015 and March 16, 2016, as more fully discussed herein, the market value of the Company's common stock declined as follows:

(a) $3.87, or 21.15%, from a closing price of $18.30 per share on November 9, 2015 to a closing price of $14.43 per share on November 10, 2015; and

(b) $0.83, or 7.87%, from a closing price of $10.55 per share on March 15, 2016 to a closing price of $9.72 per share on March 16, 2016.

The total estimated loss in market capitalization resulting from the disclosures on these two dates is approximately $361 million.

8. As a result, Plaintiffs and other Class members suffered significant economic loss and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as the Company is headquartered in this District.

12. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

13. Lead Plaintiff Clemens Schlettwein ("Schlettwein") acquired TerraForm common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

14. Lead Plaintiff Jerome Spindler ("Spindler") acquired TerraForm common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

15. Plaintiff John Chamblee ("Chamblee") acquired TerraForm common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

16. Plaintiffs Schlettwein, Spindler and Chamblee are collectively referred to herein as "Plaintiffs."

17. Defendant TerraForm is incorporated in Delaware, and the Company's principal executive offices are located at 7550 Wisconsin Avenue, 9th Floor, Bethesda, Maryland 20814. It was formed under the name SunEdison Yieldco, Inc. on January 15, 2014, as a wholly owned indirect subsidiary of SunEdison. The name change from SunEdison Yieldco, Inc. to TerraForm Power, Inc. became effective on May 22, 2014.

18. Defendant Ahmad Chatila ("Chatila") was TerraForm's Chairman of the Board from January 2014 to November 20, 2015 and remained a director until May 26, 2016. He was also President, Chief Executive Officer ("CEO") and a director of SunEdison and its predecessor from March 2009 to June 22, 2016. He also served as Chairman of the Board of TerraForm Global Inc. ("Global"), an indirect subsidiary of SunEdison, until November 20, 2015, and remained a director until May 26, 2016.

19. Defendant Carlos Domenech Zornoza ("Domenech") was President, CEO, and a director of TerraForm from January 2014 until his termination on November 20, 2015. Domenech also served as Executive Vice President and President of SunEdison and its predecessor from as early as November 2009, and was Executive Vice President of SunEdison

when he was terminated on November 20, 2015. He also held management positions at other SunEdison affiliates, including Global where he was CEO since February 2015, and a director since Global's formation in September 2014, until his termination on November 20, 2015; and SunEdison Capital, LLC where he was President from March 2013 to January 2014. Domenech was controlled by, and beholden to, SunEdison. Domenech's services to TerraForm were provided in accordance with the Management Services Agreement, and SunEdison determined and paid Domenech's compensation.

20. Defendant Brian Wuebbels ("Wuebbels") was a TerraForm director since January 2014, and the Company's President and CEO from November 20, 2015 until his resignation from the Company on March 30, 2016. Wuebbels held numerous positions at SunEdison and its predecessor since 2007, and served as SunEdison's Chief Financial Officer ("CFO") and Executive Vice President since May 2012, and Chief Administrative Officer since December 2014, until his termination in May 2016. He also served as Chief Executive Officer and President of Global from November 20, 2015 until his resignation from Global on March 30, 2016. Wuebbels was controlled by, and beholden to, SunEdison. Wuebbels' services were provided to TerraForm in accordance with the Management Services Agreement and SunEdison determined and paid Wuebbels' compensation.

21. Defendant Alejandro Hernandez ("Hernandez") served as the Company's Executive Vice President and CFO from September 17, 2014 until his termination on November 20, 2015. He also served as Global's Executive Vice President and CFO from October 9, 2015 until his termination on November 20, 2015. He reported directly to Domenech at TerraForm (and Global). Hernandez was an employee of SunEdison, and was controlled by, and beholden

to, SunEdison. His services were provided to TerraForm in accordance with the Management Services Agreement, and SunEdison determined and paid Hernandez's compensation.

22. Defendants TerraForm, Chatila, Wuebbels, Domenech, and Hernandez are collectively referred to herein as "Defendants."

**OTHER NON-PARTY TERRAFORM OFFICERS AND DIRECTORS**

23. Non-party Rebecca Cranna ("Cranna") is Executive Vice President and CFO of TerraForm since November 22, 2015. She also serves as SunEdison's Senior Vice President and CFO, Global Asset Management, since September 2014. She also serves as CFO of Global since November 22, 2015. Cranna is controlled by, and beholden to, SunEdison. Cranna's services are provided to TerraForm in accordance with the Management Services Agreement and SunEdison determines and pays Cranna's compensation.

24. Non-party Francisco Perez Gundin ("Perez"), also known as Pancho, was a director from January 2014 until November 20, 2015, and served as Executive Vice President and Chief Operating Officer ("COO") from January 2014 to January 14, 2016. He also served as COO and Executive Vice President of SunEdison from April 2015 to January 8, 2016. He also served as COO of Global and a director until November 20, 2015. Perez was controlled by, and beholden to, SunEdison. Perez' services were provided to TerraForm in accordance with the Management Services Agreement and SunEdison determined and paid Perez' compensation.

**SUBSTANTIVE ALLEGATIONS**

**Background**

25. TerraForm is headquartered in Bethesda, Maryland. The Company was formerly known as SunEdison Yieldco, Inc. and changed its name to TerraForm Power, Inc. in May 2014. TerraForm's first day of trading after its IPO was July 18, 2014, and on July 23, 2014, the

Company closed its IPO. The IPO raised net proceeds of approximately $534 million. Its stock trades on the NASDAQ under the ticker symbol "TERP."

26. TerraForm owns and operates solar and wind generation assets. As of February 20, 2015, its portfolio consisted of solar and wind projects located in the United States, Canada, the United Kingdom, and Chile.

27. TerraForm is a dividend growth-oriented company sometimes referred to as a yieldco, which was formed by its controlling shareholder, SunEdison, to own and operate clean power generation assets acquired or dropped down primarily from SunEdison but also from unaffiliated third parties.

28. During the Class Period, SunEdison beneficially owned all of TerraForm's outstanding Class B common stock. Each share of outstanding Class B common stock entitled SunEdison to ten votes on all matters presented to TerraForm's stockholders, such that SunEdison held a majority of TerraForm's combined voting power of TerraForm's stockholders. As long as it holds a majority of TerraForm's voting power, SunEdison has power to appoint all of TerraForm's directors and also has the right to expand the size of the Board and designate one or two new directors to TerraForm's Board.

29. Throughout the Class Period, the Company did not have any employees. SunEdison provided TerraForm with managerial and administrative services, including accounting, audit, information technology, financial back-office and cash-management functions pursuant to the Management Services Agreement. As such, all of the personnel who managed TerraForm's operations were employees of SunEdison and their services were provided to TerraForm pursuant to the Management Services Agreement. SunEdison determined and paid

TerraForm management's compensation, and TerraForm's management was controlled by, and beholden to, SunEdison.

30. Through its stock ownership, Board and managerial control, and TerraForm's reliance on SunEdison for drop down acquisitions and essential services under the Management Services Agreement, SunEdison exercised unfettered control over the business and affairs of TerraForm (except for the authority delegated to the Corporate Governance and Conflicts Committee of TerraForm's Board of Directors to review and authorize related-party transactions).

31. During the Class Period, there was significant overlap of TerraForm and SunEdison's management and Board members. For example, (i) Chatila was TerraForm's Chairman of the Board from January 2014 to November 2015, and remained a director throughout the Class Period. He also served as President, CEO and a director of SunEdison prior to and throughout the Class Period; (ii) Domenech was President, CEO, and a director of TerraForm from January 2014 until his termination on November 20, 2015. Domenech also served as Executive Vice President and President of SunEdison and its predecessor from as early as November 2009, and was Executive Vice President when he was terminated on November 20, 2015; (iii) Wuebbels was TerraForm's President and CEO from November 20, 2015 until his resignation after the Class Period, and was also a TerraForm director prior to and throughout the Class Period. He also served as SunEdison's CFO and Executive Vice President since May 2012 and its Chief Administrative Officer since 2014 until his termination in May 2016; (iv) Cranna is currently the Executive Vice President and CFO of TerraForm since November 22, 2015. She also currently serves as SunEdison's Senior Vice President and CFO of Global Asset Management since 2014; and (v) Perez was a director from January 2014 until November 20,

2015, and served as Executive Vice President and COO from January 2014 to January 14, 2016. He also served as COO and Executive Vice President of SunEdison from April 2015 to January 8, 2016.

32. According to a number of former employees, Chatila effectively ran everything and made all major decisions at both SunEdison and TerraForm. Defendant Domenech's top Executive Administrative Assistant from July 2014 to September 2015 stated that Chatila was everyone's boss. "Ahmad ran everything." "They all effectively reported to Ahmad." "There was constant communication with Ahmad." Typically, there was a weekly telephone conference call with Chatila, Wuebbels, Domenech, Perez, and others.

33. A TerraForm Business Development Analyst from January 2016 to June 2016 stated that it gradually became apparent that SunEdison and TerraForm were essentially operated by the same people.

34. TerraForm and SunEdison occupied a number of floors of the same building in TerraForm's headquarters in Bethesda, Maryland. According to one Executive Assistant who reported to Defendants Domenech and Hernandez and then later to CFO Cranna from November 2015 to March 2016, TerraForm and SunEdison were intricately interwoven through their staff and operations. She never knew whether any given person worked for TerraForm or SunEdison. She regularly saw SunEdison executives meeting with TerraForm executives during her tenure at the Company and observed a revolving door between the two companies.

35. Defendant Domenech's top Executive Administrative Assistant stated that "[e]verybody was interconnected with everyone else." "It was very difficult to discern who worked for whom." "The floors were intermingled" and "SunEd legal sat next to TerraForm legal." "It was all mixed together."

36. A TerraForm and SunEdison Director of Global Financial Planning & Analysis from August 2014 to May 2015 stated that the floors of TerraForm's headquarters were confusingly mixed with workers for each company. Meetings routinely occurred with no concern over who worked where. "SunEdison was handling all of the back-office functions for TerraForm," but "they were the same company." "They tried to put on a façade where it was separate," but "absolutely – they were the same company." "Just look at the officers, the Board of directors." "They were the same people."

37. Domenech's top Executive Administrative Assistant also stated that SunEdison, under Chatila's leadership, and TerraForm, participated in an effort to inspire employees of both companies to cooperate on all levels. "There was the one company cultural initiative." Throughout TerraForm's and SunEdison's offices, there were posters on "all the walls" urging workers in both companies to recognize "that we're one company with one set of values." She thought it was a bit odd as if two companies with separate finances, theoretically, should always behave as one. This was the culture at TerraForm and SunEdison.

**TerraForm's Management Services Agreement Exposed TerraForm to Risks Associated with SunEdison's Internal Financial Controls Deficiencies and Consequently, TerraForm Lacked Effective Internal Financial Controls**

38. While TerraForm disclosed the existence of the Management Services Agreement which stated that SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources and procurement to the Company, TerraForm shareholders did not know that SunEdison's woefully inadequate internal controls, which in turn rendered TerraForm's internal

controls hopelessly deficient, thereby rendered the Company incapable of producing accurate financial statements.

39. SunEdison's and TerraForm's internal financial controls were woefully inadequate. It was widely known within SunEdison and TerraForm that internal financial controls at both companies suffered from material weaknesses. As to TerraForm, those material weaknesses were the result of the services provided and systems utilized by SunEdison pursuant to the Management Services Agreement.

40. According to TerraForm's and SunEdison's Director of Global Financial Planning & Analysis, TerraForm was a company in total disarray with an inability to assess what it owned and how those assets were performing or could perform.

41. TerraForm acquired hundreds of electricity-generating facilities in North America and all over the world, each one of which had been operating using a different accounting system managed with different and incompatible accounting software including Oracle, SAP, Microsoft, etc. As a result, the Director of Global Financial Planning & Analysis and his colleagues were severely challenged to assess or quantify how TerraForm's assets were actually performing financially. "Those fundamental issues caused us major problems trying to figure out what was happening." "It was a nightmare."

42. When he tried to advocate to his supervisor, Tom Lowe, the Senior Director of Global Financial Planning & Analysis, and Defendant Domenech that the Company should pursue an integrated accounting system to monitor its huge and growing portfolio of renewable energy assets, they ignored his advice.

43. Part of the Director of Global Financial Planning & Analysis' regular duties included reviewing the annual budgets coming from hundreds of electricity-generating

installations acquired by the Company. These budgets, however, were frequently inaccurate, and produced from boilerplate functions of the particular software being used at a particular facility. "Budgets were like a mock-up trial budget … pulled from all these locations." "You would see actual material costs over budget by 100 percent someplace, but there was no way to trace it." "What was going on? We didn't know." There was no way to know and executives of TerraForm didn't care when informed of these problems.

44. As to whether there was an attempt to apply Generally Accepted Accounting Principles ("GAAP") in assessing the financial performance of TerraForm's assets, the Director of Global Financial Planning & Analysis stated that the "system was a mess." "When I got there in August 2014, it was the worst situation I had ever seen." Not only was GAAP routinely ignored in the Company's reporting of financial results, it had essentially no internal controls over the non-GAAP-compliant numbers it was reporting quarter after quarter through the first half of 2015, and executives at all levels were fully aware of this, including the CEO (Defendant Domenech), CFO (Defendant Hernandez) and other officers.

45. And worst of all, Chatila ordered employees to change numbers reported for revenue forecasts. The Director of Global Financial Planning & Analysis was occasionally asked to join weekly conference calls conducted by Chatila with TerraForm and SunEdison officers. Chatila, whom "everybody feared," led the calls and ordered all others, both TerraForm and SunEdison officials, to carry out his instructions. "You would hear people say 'I'm not going to meet my [revenue] forecast; it's not possible.'" In response, Chatila "would say 'I don't care what's possible, I'm telling you what will happen. Just put down the numbers.'"

46. According to a July 22, 2016 securities class action complaint filed in the Eastern District of Missouri (the "Missouri complaint") against Chatila and Wuebbels, SunEdison's

internal financial controls were completely inadequate. The Head of Global Field Operations for SunEdison from April 2015 to November 2015 stated that "everyone at the entire company knew it was the worst part of the business." As a result of SunEdison's ineffective internal controls, SunEdison was "the most dysfunctional company [he] ever worked for" with "unexplained bad" accounting systems, no security on data, no checks and balances on data access and data input, and, overall, an utter lack of internal controls in place. Likewise, the Project Coordinator & A/P Analyst, who worked at SunEdison from May 2013 to May 2016, explained that while SunEdison purported itself to be "the biggest renewable energy company in the world," SunEdison, in part because of its ineffective system of internal controls over financial reporting, was in reality "the biggest joke in the world."

47. According to the Missouri complaint, at the heart of SunEdison's ineffective internal controls over financial reporting was the fact that SunEdison, as a result of its business strategy of acquiring renewable energy companies and then developing and managing these companies' projects, never integrated the acquired companies' accounting systems with its own and thus never created a single, effective and accurate reporting system, just as it failed to do for TerraForm.

48. Rather than forming a coherent system of financial reporting in which SunEdison employees could input project costs and revenues into a unified system, SunEdison's piecemeal system of financial reporting made it impossible for anyone at SunEdison to ever know how much money it had and what was owed to creditors. The Project Coordinator & A/P Analyst explained that because of SunEdison's "shopping spree," SunEdison used multiple enterprise resource planning ("ERP") systems, including Timberline, Oracle, Paramount, SAP, as well as

SAM, SunEdison's project information database, and SunEdison never integrated any of these systems into a single accounting platform.

49. Not only did SunEdison rely on numerous accounting platforms to report revenue and costs, none of these accounting systems worked together. For example, if a SunEdison employee adjusted a line on a project, that same adjustment would have to be manually entered across every accounting system in order to accurately reflect the change. According to the Missouri complaint, the Senior Auditor & Accountant who worked at SunEdison from September 2012 to September 2014 and who evaluated SunEdison's internal controls "every single day," stated that "it was a nightmare to consolidate." The Head of Global Field Operations stated that such manual inputting of data across platforms led to "bastardized" financial results so that there was "never a true version of the truth." Moreover, as SunEdison continued to acquire companies throughout the Class Period, many of which were dropped down into TerraForm, SunEdison continued to introduce more accounting systems and processes and was so disorganized that SunEdison could not even accurately keep track of how many projects or employees it had – much less available cash and debts owed to creditors. As the Head of Global Field Operations explained the situation with SunEdison's many accounting systems, "every division was off in their own world" and it was impossible to have accurate consolidation.

50. The process for manually entering SunEdison's financial data was labyrinthine and prone to creating and perpetuating accounting errors. Throughout the Class Period, the practice was to manually consolidate SunEdison's financial data into an Excel spreadsheet. According to the Missouri complaint, the Senior Auditor & Accountant stated that all of the entities using one system, for example, Timberline, had to input their financial data into the system, close out, and those entries would then be passed to SunEdison's Finance Department.

Each SunEdison project or acquisition would then have to go through this process on its own. The controller for each group would go through the line items for each project. After this was done for each project in each accounting system, SunEdison's Finance Department would then consolidate each project from each accounting system into a massive Excel spreadsheet document, done manually. This process was so complicated and time-consuming that the Head of Global Field Operations explained that this consolidated Excel spreadsheet was "literally the most complicated spreadsheet" he had ever seen and was known internally as the "Brain Damage" spreadsheet. As a result of this process, the Head of Global Field Operations recalled that SunEdison's internal controls were a "web of chaos and confusion" and "the biggest mess ever" and that SunEdison's system of financial reporting was so "mind bogglingly" poor that the Head of Global Field Operations thought it had to have been "intentional" because it inevitably led to "massive underpayment" to SunEdison's creditors. SunEdison's internal control systems were so complicated that the Head of Global Operations, in his resignation email to his supervisor, Gokul Krishnan, dated October 5, 2015, took the time to express just how flawed SunEdison's internal controls were and were part of the reason he could not effectively do his job, thus forcing him to resign:

> Complicated systems and process – this is probably the biggest weakness at SunEdison currently and there was never a true focus on getting them fixed. There were a lot of meetings and a lot of discussions on it but in the end not much would change and the hard part of this was me and my team ended up being the brunt of most of the gaps in the systems and having to explain these to partners or other internal teams ….

51. Additionally, SunEdison's use of an Excel spreadsheet was a profoundly flawed method for accounting for SunEdison's complex financial transactions because Excel, particularly as SunEdison used it, is not a proper accounting platform. Unlike proper accounting software, which has built-in controls, Excel has no input controls to ensure that data is entered

correctly by code and category. As such, line items that are incorrectly entered can go unnoticed and generate domino effects of miscalculations. According to the Missouri complaint, this caused data to be misclassified and financial information misreported such that large amounts of money per project were lost in the reconciliation process for any given project at any given time, resulting in, as explained by the Head of Global Field Operations, multi-million dollar swings on any project at any given time. As he explained, hundreds of millions of dollars were impacted and the numbers were "insanely inaccurate." For example, in late 2015, SunEdison engaged the solar contracting company Bright Planet Solar, for which the Head of Global Field Operations worked after he left SunEdison, and SunEdison, based on its accounting, claimed that it owed Bright Planet only $800,000. However, based on emails in mid-2016, SunEdison actually owed Bright Planet in excess of $2 million.

52. In violation of basic internal control principles, SunEdison also lacked "access controls" to its Excel spreadsheets system. Consequently, anyone with even minimal security clearance had access to, and could make changes to, SunEdison's central reporting system. Access controls regulate and restrict users' ability to make certain data entries unless users provide the appropriate clearance. As explained in the Missouri complaint, the Head of Global Field Operations stated that SunEdison "gave authority to the lowest level employee, like call center people, who could go in and change the economics of any deal." During the Class Period, SunEdison's access controls were so defective and had such "insanely bad data integrity" that the Head of Global Field Operations and the Project Coordinator & A/P Analyst had access to SunEdison's financial data even after leaving the company.

53. Although employees manually entered data by mistake, the Missouri complaint also states that data was entered incorrectly on purpose. According to the Head of Global Field

Operations, there was "massive pressure" from SunEdison executives to show progress on all projects and accounts. As the Head of Global Field Operations reported, every month, there would be a meeting to update the sales and operations executives on the state and finances of SunEdison's projects. In preparation for these meetings, in order to show purported project progress, sales employees engaged in "massive cleanups" which included account managers improperly changing the numbers on projects to make a project look more favorable. The Head of Global Field Operations explained that "anyone with access could change the economics of a deal" and that prior to monthly meetings, there was a "mad dash" to get the numbers updated and show progress.

54. According to the Missouri complaint, numerous former employees of SunEdison have explained that Defendants Chatila and Wuebbels knew of SunEdison's flawed internal control over financial reporting. With respect to problems associated with having multiple accounting systems which did not effectively integrate SunEdison's financial information, the Head of Global Field Operations explained that he attended meetings focused on integration issues beginning in May or June 2015 in SunEdison's Belmont office, and that he remembered Defendant Wuebbels attended at least one of those meetings. The Head of Global Field Operations also recalled Wuebbel's direct report, Rajiv Krishnan, SunEdison's CFO of Residential Small Commercial, routinely attended these meetings, during which this integration issue was specifically discussed and internal reports concerning these issues were distributed.

55. With respect to problems associated with consolidating SunEdison's financial data into Excel, these problems existed for quite some time, were so obvious, and so detrimental that the Senior Auditor & Accountant stated that Defendants Chatila and Wuebbels were "of course" aware of the inconsistencies and incorrect data that was represented and that "everyone"

within SunEdison knew about it because "it had been going on for years," that "it's hard to imagine [Wuebbel's] not knowing about it," and that he would "challenge anyone" who might claim that Wuebbels and Chatila did not know of these problems. Likewise, the Head of Global Field Operations explained that he reported these issues to his supervisors, Gokul Krishnan, the COO, Global Residential & Small Commercial Solar, who reported directly to Vikas Desai, the Senior Vice-President and Global General Manager for the Residential and Small Commercial Business. Desai reported directly to Defendant Chatila. The Head of Global Field Operations would report these issues in meetings three to four times a month with Krisnan and was told that resolving SunEdison's internal control problems was "priority number 1" and the executive team, including Defendant Wuebbels, was in the process of dealing with it.

**SunEdison, on Which TerraForm was Admittedly Dependent for Drop Down Acquisitions, Was Misrepresenting and Omitting Material Facts Concerning Its Debt and Liquidity Which Could Affect SunEdison's Ability to Continue to Drop Down Acquisitions into TerraForm and Thereby Negatively Affect TerraForm's Stated Growth Strategy**

56. From the beginning of the Class Period through 2015, SunEdison, Chatila and Wuebbels consistently reassured the market that they were "comfortable" with SunEdison's "solid" liquidity position. In reality, SunEdison was experiencing a liquidity crisis from at least the beginning of the Class Period, and Defendants Chatila and Wuebbels were very much aware of the situation.

57. SunEdison, at the direction of Chatila and Wuebbels, routinely delayed or refused to pay key vendors even when those vendors threatened to cease all services. This was done in order to maximize the publicly reported cash on its balance sheet and hide the fact that it was experiencing liquidity shortfalls.

58. According to the Missouri complaint, this practice was confirmed by the Project Coordinator & A/P Analyst who, as previously stated, worked at SunEdison from May 2013 to

May 2016 and reported directly to Justin Tomljanovic, the CFO of SunEdison North America, who in turn reported to Defendant Wuebbels. The Project Coordinator & A/P Analyst, who had access to SunEdison's financial records and was directly involved in paying vendors and other invoices on projects, explained that SunEdison "never had cash," and that its liquidity problem was so obvious that "even the janitor" knew of the problem. She explained that SunEdison's practice was to pay vendors in the priority of which vendor was refusing to work and would cause the greatest harm to the company's ability to generate revenue or effectively shut down projects. When it came to paying vendors, she "had to beg" and fight with Zach Groves, SunEdison's Director of Finance, for funds.

59. Similarly, SunEdison and TerraForm's former Director of Global Financial Planning & Analysis, who, as previously stated, was employed from August 2014 through May 2015, explained that SunEdison's liquidity problems existed from the beginning of his employment and that SunEdison "owed everyone tons of money."

60. In the summer and fall of 2014, SunEdison's cash position was so poor that it was commonplace to not pay essential vendors such as basic utilities, including telephone and electricity service providers, who threatened to shut down service.

61. The former Executive Assistant to Defendant Hernandez from February 2015 to August 2015 explained that there were consistent problems paying vendors. Even the temp agency which initially got her the job at TerraForm reached out to her personally to advise her that its fee had not been paid by SunEdison and that it was unable to obtain the money SunEdison owed it. She added that almost every bill to vendors was overdue, some by as much as 180 days.

62. Throughout the Class Period, SunEdison also failed to timely pay (i) vendors that supplied it with necessary safety and compliance testing for equipment; (ii) essential equipment and industrial supplies providers; (iii) government entities for fees in connection with permits and licenses for its solar and wind projects; and (iv) Garrad Hassan, a large wind-energy consulting group that SunEdison hired to perform due diligence on its acquisitions to be dropped down into TerraForm. Some companies, including Aerotek, Inc. and Paragon Partners, Ltd., even filed suits against SunEdison in April 2016 for its failure to pay them.

63. Defendants Chatila and Wuebbels were well aware of SunEdison's repeated failure to pay vendors, as explained in the Missouri complaint. According to the Senior Auditor & Accountant, "Wuebbels wanted to know about everything" and payments to vendors were discussed during weekly meetings and monthly finance meetings, both of which Wuebbels either personally attended or the results of which were brought to his attention by Marie Washburn, SunEdison Controller; Jenny Cooper, SunEdison's CFO of Global Operations; or SunEdison's Director of Accounting. During these weekly "cash calls," the CFOs of each region and their teams would take turns discussing the status of projects and cash needs in order to persuade the Finance Department to issue the funds necessary to pay vendors. The Project Coordinator & A/P Analyst, who participated in these calls from 2014 to 2016, explained that Zach Groves, SunEdison's Director of Finance, would lead the calls and distribute the cash, but it was Wuebbels who had to approve or "sign off" on the decisions.

64. Additionally, SunEdison's former Director of Asset Management and Operations from December 2014 to December 2015 recalled a January 2015 "all hands" conference call led by Defendant Chatila in which a SunEdison employee raised that the company had been warned three times by a utility provider that it would turn off phone service because SunEdison had not

paid its bills, and that suppliers were "breathing down their necks" and wanted escrow for lines of credit with SunEdison. In response, Defendant Chatila went on a rant and stated that employees could work for a company that grew slowly (and thus had the cash to timely pay its vendors) or could work for SunEdison, which was a big, fast growth company. Chatila added that these were the sacrifices that SunEdison would make for growth.

65. Throughout the Class Period, Defendant Chatila also directly addressed SunEdison's delayed payments to its vendors during quarterly live-casts to SunEdison employees during which Chatila acknowledged that SunEdison's problems paying its vendors was a "broken system" which he promised to fix.

66. As time went on, SunEdison's liquidity challenges grew worse. By the first quarter of 2015, SunEdison lacked the cash to sustain its acquisition-driven, yieldco-dependent business model. In the spring of 2015, SunEdison took on massive debt consisting of $337 million in 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes") and a $410 million two-year loan (the "Margin Loan") in order to fund a new large acquisition. In presentations and SEC filings, SunEdison, Chatila and Wuebbels falsely classified the Exchangeable Notes and the Margin Loan as non-recourse debt, but in reality, it was disclosed months later in mid-November 2015 in its public filing that this debt was actually recourse debt. This caused highly significant repercussions for TerraForm's stock as TerraForm repeatedly told the market that the Company's growth depended on SunEdison's ability to continue to acquire and drop down new acquisitions into TerraForm.

67. Defendants Chatila and Wuebbels also falsely reassured the market on August 6, 2015 during a joint SunEdison/TerraForm conference call that SunEdison had "greater than $1 billion" available, and Defendant Hernandez, during that same call, stated: "In addition to our

balance sheet liquidity we also benefit from incremental liquidity provided by the warehouse facilities we have placed in order with our sponsor SunEdison and our infrastructure partners." "In addition to maintaining significant balance sheet liquidity, the warehouses [credit facility] we have developed with SunEdison and our infrastructure partners provide another important tool to fund [TerraForm's] growth with significant financial flexibility." This led analysts to comment positively that any liquidity concerns regarding SunEdison "appear [] more of a perception than a reality." However, after the end of the Class Period, the market learned in a March 28, 2016 *Wall Street Journal* article entitled "SEC Investigating SunEdison's Disclosures to Investors About Its Liquidity" that the $1 billion included a $500 million warehouse credit facility "that SunEdison couldn't access" and should never have been included in SunEdison's liquidity calculations.

68. Because SunEdison was running out of funds and scrambling for ways to raise cash, Defendant Chatila put pressure on TerraForm to pay for SunEdison's expenses outside of the Management Services Agreement. Domenech's top Executive Administrative Assistant stated that "TerraForm's numbers were better than SunEdison's," and SunEdison used TerraForm to pay the costs of administering and operating a worldwide effort to expand renewable energy generation through the Management Services Agreement. TerraForm would acquire SunEdison projects as drop down acquisitions and then pay SunEdison to manage those projects that TerraForm acquired. But SunEdison was also using TerraForm as its piggy bank to pay for costs beyond what was due pursuant to the Management Services Agreement. TerraForm "was paying for everything, everything," and Defendants Domenech and Hernandez were concerned about excessive "chargebacks" by SunEdison outside of the already expansive Management Services Agreement. Defendants Domenech and Hernandez and all other

TerraForm executives were well aware of this issue, but deferred to anything Chatila wanted them to do. TerraForm executives were concerned about whether SunEdison would succeed financially and knew that TerraForm was spending significant cash to prop up SunEdison and Chatila. Domenech's top Executive Administrative Assistant also believed that "they were playing games with the numbers."

69. Although the market had no knowledge at the time, SunEdison later admitted to the Bankruptcy Court for the Southern District of New York on April 21, 2016, that "in October 2015 the entire Margin Loan became mandatorily prepayable. This Prepayment, which amounted to $439 million, drained SunEdison's cash reserves and fundamentally changed its and the YieldCos' financial outlook."

70. According to a complaint filed in 2016 in Delaware's Court of Chancery against SunEdison, Chatila, and Wuebbels (the "Delaware complaint"), in or about late October 2015, SunEdison told Defendant Hernandez that SunEdison had a short-term need for additional cash, and Defendants Domenech and Hernandez, and Perez, raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition. Defendants Domenech, Hernandez, Chatila, and Wuebbels did not disclose SunEdison's liquidity problem to TerraForm investors even though they knew that TerraForm's growth strategy was dependent on SunEdison's ability to acquire new projects to be dropped down into TerraForm.

71. According to the Delaware complaint, on November 18, 2015, the TerraForm and Global Corporate Governance and Conflicts Committees, along with their legal and financial advisors, reviewed a variety of potential alternatives for making $100 million available to SunEdison, but ultimately concluded that they could not execute any of these transactions in the

time period requested by SunEdison, including because SunEdison would not agree to governance changes as part of any deal.

72. In retaliation and in order to obtain much needed cash, on November 19, 2015, SunEdison's Board called meetings of TerraForm's and Global's Boards for November 20 to replace those companies' senior management and the members of the Corporate Governance and Conflicts Committees.

73. On November 20, 2015, SunEdison reconstituted TerraForm (and Global's) Board of Directors and dispensed with TerraForm (and Global's) management. SunEdison used its legal and contractual authority to: (i) appoint Peter Blackmore ("Blackmore") and Jack Jenkins-Stark ("Jenkins-Stark") as directors of TerraForm, whereupon the Board voted to expand itself and elect Christopher Compton ("Compton") as a director of TerraForm; (ii) appoint Blackmore as Chairman of the Board after Chatila's resignation as Chairman of the Board; (iii) replace the existing Corporate Governance and Conflicts Committees of TerraForm (and Global) with Blackmore, Jenkins-Stark and Compton; (iv) terminate Defendant Domenech as TerraForm's (and Global's) President and CEO, and terminate his employment with SunEdison (thus removing him from the Boards of those companies); (v) terminate Defendant Hernandez as TerraForm's (and Global's) CFO, and terminate his employment with SunEdison; and (vi) appoint Wuebbels as TerraForm's (and Global's) President and CEO, and another SunEdison executive as TerraForm's (and Global's) interim CFO.

74. As a result of their disagreement with these actions, Perez, Mark Florian ("Florian") and Mark Lerdal ("Lerdal") resigned from the TerraForm Board on November 20, 2015 after these actions were taken. Prior to the meeting, Lerdal was the chairperson of the

TerraForm and Global Corporate Governance and Conflicts Committees and a member of the Audit Committee of TerraForm's Board.

75. In the afternoon of November 20, 2015, the newly reconstituted TerraForm and Global Boards and Corporate Governance and Conflicts Committees approved the terminations of Defendants Domenech and Hernandez and the appointments of Blackmore, Jenkins-Stark and Compton to the Corporate Governance and Conflicts Committees.

76. That same day, the newly appointed Corporate Governance and Conflicts Committee of Global met telephonically and agreed to advance $231 million to SunEdison (to be paid in two installments – a first installment of $150 million, and a second of $81 million to be paid within three business days) in order to facilitate SunEdison's completion of certain renewable energy projects in India and to secure a transfer of SunEdison's equity interests in these projects to Global in the near term.

77. Within minutes of Global's Corporate Governance and Conflicts Committee's approval of the transaction, Wuebbels caused $150 million to be wired from Global's bank account to SunEdison. Instead of using the $150 million for purposes of the India transaction, SunEdison used $95 million of the funds extracted from Global to pay off its margin loan mere minutes before a payment deadline that same day.

78. On November 22, 2015, Cranna was appointed Executive Vice President and CFO of TerraForm (and Global).

**MATERIALLY FALSE AND MISLEADING**
**<u>STATEMENTS ISSUED DURING THE CLASS PERIOD</u>**

79. The Class Period begins on July 18, 2014 when TerraForm's stock began trading in connection with its IPO. The July 17, 2014 Prospectus stated in part:

Our growth strategy is dependent to a significant degree on acquiring new solar energy projects from our Sponsor and third parties.

***

***Our Sponsor will be our controlling stockholder and will exercise substantial influence over TerraForm Power, and we are highly dependent on our Sponsor.***

***

Our ability to execute our growth strategy is dependent on our ability to acquire additional clean power generation assets from our Sponsor and unaffiliated third parties.

80. The statements made by Defendants in ¶ 79 were false and/or misleading statements and/or failed to disclose that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy.

**Second Quarter of 2014**

81. On September 2, 2014, TerraForm issued a press release and filed a Current Report on Form 8-K with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 8-K"). For the quarter, TerraForm reported a net loss of $12.44 million.

82. On September 2, 2014, TerraForm also filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2014 8-K and reporting in full its financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). In addition to the information described *supra* at ¶ 81, TerraForm compared the Company's net loss of $12.44 million to a net profit of $341,000 for the same period in the prior year, and reported revenue of $21.97 million, compared to revenue of $4.66 million for the same period in the prior year.

83. In the Q2 2014 10-Q, TerraForm stated, in part:

> *Management Services Agreement*
>
> Immediately prior to the completion of the IPO on July 23, 2014, [TerraForm] … entered into a management services agreement (the "Management Services Agreement" or "MSA") with SunEdison. Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services to [TerraForm] and its subsidiaries.
>
> ***
>
> *Changes in Internal Control Over Financial Reporting*
>
> There have been no changes in [TerraForm's] internal control over financial reporting during the quarter ended June 30, 2014 that have materially affected, or are reasonably likely to materially affect, [TerraForm's] internal control over financial reporting.

84. The Q2 2014 10-Q also stated that "[o]ur growth strategy is dependent on our ability to acquire additional clean power generation assets from SunEdison and unaffiliated third parties."

85. The Q2 2014 10-Q contained signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Domenech and Senior Vice President and Chief Financial Officer, Sanjeev Kumar, stating that the Q2 2014 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

86. The statements made by Defendants in ¶¶ 81-85 were false and/or misleading statements and/or failed to disclose: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal

financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

**Third Quarter of 2014**

87. On November 6, 2014, TerraForm issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 8-K"). For the quarter, TerraForm reported a net loss of $4.01 million, or $0.15 per diluted share, on revenue of $53.22 million, compared to revenue of $5.40 million for the same period in the prior year.

88. On November 6, 2014, TerraForm also filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2014 8-K and reporting in full its financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

89. In the Q3 2014 10-Q, TerraForm stated, in part:

> *Management Services Agreement*
>
> Immediately prior to the completion of the IPO on July 23, 2014, [TerraForm] … entered into the MSA with SunEdison. Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

***

*Changes in Internal Control Over Financial Reporting*

> There have been no changes in the Company's internal control over financial reporting … during the quarter ended September 30, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

90. The Q3 2014 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the Q3 2014 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

91. On January 9, 2015, the Company filed a Prospectus with the SEC (Registration No. 333-200829) relating to the resale of Class A common stock that had been sold to selling stockholders in a private offering. The January 9, 2015 Prospectus stated, in part:

> Our growth strategy is dependent to a significant degree on acquiring new solar energy projects from our Sponsor and third parties. Our Sponsor's or such third parties' failure to complete such projects in a timely manner, or at all, could have a material adverse effect on our growth strategy.

92. The January 9, 2015 Prospectus also stated, in part:

*Management Services Agreement*

> Immediately prior to the completion of the IPO on July 23, 2014, [TerraForm] entered into the MSA with SunEdison. Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, information technology, insurance, employee

> benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

93. On January 20, 2015, the Company filed a Prospectus with the SEC (Registration No. 333-200830) relating to the resale of Class A common stock. The January 20, 2015 Prospectus stated, in part:

> Our growth strategy is dependent to a significant degree on acquiring new solar energy projects from our Sponsor and third parties. Our Sponsor's or such third parties' failure to complete such projects in a timely manner, or at all, could have a material adverse effect on our growth strategy.

94. The January 20, 2015 Prospectus also stated, in part:

> *Management Services Agreement*
>
> Immediately prior to the completion of the IPO on July 23, 2014, [TerraForm] entered into the MSA with SunEdison. Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

95. The statements made by Defendants in ¶¶ 87-94 were false and/or misleading statements and/or failed to disclose: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

**Fourth Quarter and Full Year 2014**

96. On February 18, 2015, the Company issued a press release and filed a Current Report on Form 8-K reporting certain of its financial and operating results for the fourth quarter and year ended December 31, 2014 (the "2014 8-K"). For the quarter, TerraForm reported revenue of $43 million, "reflecting the positive impact of acquisitions and ***drop downs*** during the quarter." For 2014, TerraForm reported a net loss of $75.75 million on revenue of $125.86 million, compared to a net loss of $280,000 on revenue of $17.47 million for the same period in the prior year.

97. On March 13, 2015, the Company filed an Annual Report on Form 10-K with the SEC, reiterating certain financial and operating results previously announced in the 2014 8-K and reporting in full its financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). In addition to the information described *supra* at ¶ 96, TerraForm reported a net loss of $125.86 million, or $0.87 per diluted share.

98. In the 2014 10-K, TerraForm stated, in part:

> *Changes in Internal Control Over Financial Reporting*
>
> There have been no changes in the Company's internal control over financial reporting … during the year ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.
>
> ***
>
> *Management Services Agreement*
>
> Immediately prior to the completion of the IPO on July 23, 2014, [TerraForm] entered in to the [MSA] with SunEdison. Pursuant to the [MSA], SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

99. In the 2014 10-K, TerraForm also stated (emphasis in original):

> ***The growth of our business depends on locating and acquiring interests in additional, attractive clean energy power generation facilities from SunEdison and unaffiliated third parties at favorable prices.*** Our primary business strategy is to acquire clean energy power generation facilities that are operational from both SunEdison and third parties.
>
> ***
>
> ***SunEdison is our controlling stockholder and exercises substantial influence over TerraForm Power, and we are highly dependent on SunEdison.***

100. The 2014 10-K contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the 2014 10-K did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

101. On April 9, 2015, the Company filed a Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock. The April 9, 2015 Prospectus stated, in part:

> *Management Services Agreement*
>
> Immediately prior to the completion of our IPO, [TerraForm] and SunEdison entered into the [MSA] pursuant to which SunEdison agreed to provide or arrange for other service providers to provide management and administrative services to us and our subsidiaries.
>
> *Services Rendered*
>
> Under the [MSA], SunEdison or certain of its affiliates provides or arranges for the provision by an appropriate service provider of the following services:

- causing or supervising the carrying out of all day-to-day management, secretarial, accounting, banking, treasury, administrative, liaison, representative, regulatory and reporting functions and obligations.

***

- recommending and implementing our business strategy, including potential new markets to enter;

***

- arranging for individuals to carry out the functions of principal executive, accounting and financial officers for purposes of applicable securities laws;
- providing individuals to act as senior officers as agreed from time-to-time, subject to the approval of the relevant board of directors or its equivalent;

***

102. The statements made by Defendants in ¶¶ 96-101 were false and/or misleading statements and/or failed to disclose: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

**First Quarter of 2015**

103. On May 7, 2015, TerraForm issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for

the quarter ended March 31, 2015 (the "Q1 2015 8-K"). For the quarter, TerraForm reported a net loss of $28.12 million, or $0.57 per diluted share, on revenue of $70.52 million, compared to revenue of $11.88 million for the same period in the prior year.

104. On May 7, 2015, TerraForm also filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q1 2015 8-K and reporting in full its financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").

105. In the Q1 2015 10-Q, TerraForm stated, in part:

> *Management Services Agreement*
>
> General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the Management Services Agreement. Pursuant to the Management Services Agreement, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting*
>
> There have been no changes in the Company's internal control over financial reporting … during the three months ended March 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

106. The Q1 2015 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the Q1 2015 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or

caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

107. On May 7, 2015, the Company filed a Prospectus Supplement No. 1 to the April 9, 2015 Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock. The May 7, 2015 Prospectus Supplement stated, in part:

> *Management Services Agreement*
>
> General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the [MSA]. Pursuant to the [MSA], SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting*
>
> There have been no changes in the Company's internal control over financial reporting … during the three months ended March 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

108. On May 8, 2015, the Company filed a Prospectus Supplement No. 2 to the April 9, 2015 Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock. The May 8, 2015 Prospectus Supplement stated, in part:

> *Management Services Agreement*
>
> Immediately prior to the completion of the IPO on July 23, 2014, [Terraform] entered into the [MSA] with SunEdison. Pursuant to the [MSA], SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax treasury, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

109. The statements made by Defendants in ¶¶ 103-108 were false and/or misleading statements and/or failed to disclose that TerraForm's Management Services Agreement with

SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements.

**Second Quarter of 2015**

110. On August 6, 2015, TerraForm issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 8-K"). For the quarter, TerraForm reported net income of $17.44 million, or $0.10 per diluted share, on revenue of $130.05 million, compared to revenue of $22.38 million for the same period in the prior year.

111. On August 6, 2015, TerraForm also filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2015 8-K and reporting in full its financial and operating results for the quarter ended June 30, 2016 (the "Q2 2015 10-Q").

112. In the Q2 2015 10-Q, TerraForm stated, in part:

> *Management Services Agreement*
>
> General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the [MSA]. Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting*
>
> There have been no changes in the Company's internal control over financial reporting … during the three and six months ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

113. The Q2 2015 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the Q2 2015 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

114. That day, TerraForm and SunEdison hosted a joint conference call for investors and analysts to discuss, in part, the results in the Q2 2015 10-Q. As part of his prepared remarks, Defendant Hernandez stated, in part:

> In addition to our balance sheet liquidity we also benefit from incremental liquidity provided by the warehouse facilities we have placed in order with our sponsor SunEdison and our infrastructure partners…In addition to maintaining significant balance sheet liquidity, the warehouses we have developed with SunEdison and our infrastructure partners provide another important tool to fund the growth with significant financial flexibility.

115. On August 6, 2015, TerraForm also filed Prospectus Supplement No. 6 to the April 9, 2015 Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock, which incorporated the Q2 2015 10-Q.

116. In the August 2015 Prospectus Supplement, TerraForm stated, in part:

> *Management Services Agreement*
>
> General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the [MSA]. Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

* * *

> *Changes in Internal Control Over Financial Reporting*
>
> There have been no changes in the Company's internal control over financial reporting … during the three and six months ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

117. The statements made by Defendants in ¶¶ 110-116 were false and/or misleading statements and/or failed to disclose: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

**Third Quarter of 2015**

118. On November 9, 2015, TerraForm issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 8-K"). For the quarter, TerraForm reported a net loss of $820,000, or $0.03 per diluted share, on revenue of $163.29 million, compared to a net loss of $4.01 million, or $0.15 per diluted share, on revenue of $53.57 million for the same period in the prior year.

119. On November 9, 2015, TerraForm filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2015 8-K and reporting in full its financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").

120. In the Q3 2015 10-Q, TerraForm stated, in part:

> *Management Services Agreement*
>
> General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the Management Services Agreement ("MSA"). Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company.
>
> ***
>
> ***Current Market Conditions Have Increased Certain of the Risks We Face.***
>
> ***
>
> Risks that have increased as a result of these developments include, but are not limited to, risks related to access to capital and liquidity and risks related to the performance of third parties, including SunEdison, our controlling shareholder. We have significant relationships with, and in certain areas depend significantly on, SunEdison. In particular, SunEdison provides management and operational services and other support. Our growth strategy depends on our ability to identify and acquire additional renewable facilities from SunEdison (including Call Right Projects) and unaffiliated third parties. We interact with or depend on SunEdison for many third party acquisition opportunities, including through the joint purchase of certain companies, and for operations and maintenance support on various pending and completed transactions. As a result, our financial and operating performance and prospects, including our ability to grow our dividend per share, may be affected by the performance, prospects, and priorities of SunEdison, and material adverse developments at SunEdison or changes in its strategic priorities may materially affect our business, financial condition and results of operations.
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting*
>
> During the third quarter of 2015, we completed the implementation of a new global consolidation system that will enhance our consolidation processes, and we are in the

> process of implementing a new global enterprise resource planning system ("ERP") that will enhance our business and financial processes and standardize our information systems. In October 2015, we substantially completed the ERP implementation with respect to several operations and will continue to roll out the ERP in phases over the next several years. As with any new information systems we implement, these applications, along with the internal controls over financial reporting and consolidation included in these processes, will require testing for effectiveness. In connection with these implementations, we are updating our internal controls over financial reporting and consolidation, as necessary, to accommodate modifications to our business processes and accounting procedures. We do not believe that these implementations will have an adverse effect on our internal control over financial reporting or consolidation. Except as described above, there were no changes in SunEdison's internal control over financial reporting during the quarter ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

121. The Q3 2015 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the Q3 2015 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

122. The statements made by Defendants in ¶¶ 118-121 were false and/or misleading statements and/or failed to disclose: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to

TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

**The Truth Emerges**

123. On October 5, 2015, SunEdison filed a Form 8-K with the SEC announcing layoffs of 15% of its workforce and restructuring charges of $30 to $40 million for the third quarter of 2015 through the first quarter of 2016. The following day, the *Wall Street Journal* reported that SunEdison had failed to make a required $400 million upfront payment for a roughly $700 million planned acquisition. It quickly became apparent to the market that SunEdison was over-leveraged and lacked the cash to sustain its acquisition-driven, yield-co-dependent business model. Several prominent hedge funds sold their SunEdison positions as analysts downgraded the stock.

124. On November 9, 2015, after the close of markets, SunEdison filed a quarterly report on Form 10-Q with the SEC announcing its financial and operating results for the third quarter ended September 30, 2015. SunEdison revealed devastating facts concerning its debt and liquidity. SunEdison disclosed: (i) the terms of a Goldman Sachs loan, which contradicted its statements made in SunEdison's August 6, 2015 10-Q that the company's liquidity would be sufficient to support its operations for the next 12 months and that the company's available cash on hand would meet its capital needs for the remainder of 2015 as well as Defendant Wuebbels' statement made during an August 6, 2015 conference call with investors during which he stated that "we don't see any additional financings to be able to achieve this growth"; (ii) that it had been required to deposit an additional $91 million in cash collateral on the Margin Loan in October 2015; and (iii) that it had reclassified the $740 million of debt under the Margin Loan

and Exchangeable Notes from non-recourse to recourse debt, thus giving its lenders access to more collateral. This news concerning SunEdison's debt and liquidity caused TerraForm's stock to plunge.

125. On this news, TerraForm stock fell $3.87, or 21.15%, to close at $14.43 on November 10, 2015.

126. On November 23, 2015, SunEdison filed a Form 8-K disclosing that, on November 20, 2015: (1) Defendant Domenech, Executive Vice President of SunEdison and President and CEO of TerraForm and Global, was removed from his respective roles at TerraForm and Global and terminated by SunEdison; and (2) Blackmore resigned as a director of SunEdison and was appointed to serve as a director of TerraForm and Global.

127. On November 27, 2015, TerraForm filed a Form 8-K disclosing that, on November 20, 2015, SunEdison used its legal and contractual authority to: (i) appoint Blackmore and Jenkins-Stark as directors of TerraForm, whereupon the Board voted to expand itself and elect Compton as a director of TerraForm; (ii) appoint Blackmore as Chairman of TerraForm after the resignation of Chatila as Chairman of the Board; (iii) replace the existing TerraForm Corporate Governance and Conflicts Committee with Blackmore, Jenkins-Stark and Compton; (iv) terminate Defendant Domenech as TerraForm's President and CEO, terminate his employment with SunEdison, and remove him as a member of TerraForm's Board; (v) terminate Defendant Hernandez as TerraForm's Executive Vice President and CFO, and terminate his employment with SunEdison; and (vi) appoint Wuebbels as TerraForm's President and CEO and another SunEdison executive as TerraForm's interim CFO. The November 27, 2015 Form 8-K further disclosed that: (vii) on November 22, 2015, Cranna was appointed to serve as TerraForm's Executive Vice President and CFO on a permanent basis; and (viii) Perez, Florian

and Lerdal resigned from the Board as a result of their disagreement with the actions described above. Prior to the meeting, Lerdal was the chairperson of the Corporate Governance and Conflicts Committee and a member of the Audit Committee of the Board.

128. On February 29, 2016, SunEdison announced that it was delaying the filing of its fiscal year 2015 Form 10-K with the SEC, citing "(1) the need to complete all tasks and steps necessary to finalize the annual financial statements and the other disclosures required to be included in that filing, and (2) ongoing inquiries and investigations by the Audit Committee . . . relating to allegations concerning the accuracy of SunEdison's anticipated financial position." SunEdison stated that it expected to file its Form 10-K by March 15, 2016.

129. On February 29, 2016, TerraForm also announced that it was delaying the filing of its fiscal year 2015 Form 10-K with the SEC and also expected to file the Form 10-K by March 15, 2016. Although Defendants knew more, TerraForm cited only "the need to complete all steps and tasks necessary to finalize the Company's annual financial statements and other disclosures required to be in the filing."

130. On March 16, 2016, SunEdison announced a further delay in the filing of its Form 10-K beyond the extended due date of March 15, 2016, after "the identification by management of material weaknesses in its internal controls over financial reporting."

131. On March 16, 2016, TerraForm also announced a further delay in the filing of its Form 10-K beyond the extended due date of March 15, 2016. TerraForm stated, in part (emphasis added):

> On February 29, 2016, TerraForm Power filed a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission (the "SEC") regarding our delayed Form 10-K principally due to the need to complete all steps and tasks necessary to finalize our annual financial statements and other disclosures. At that time, we expected that we would be able to file our Form 10-K within the 15-day extension period provided by Form 12b-25.

On February 29, 2016, SunEdison ("SunEdison"), a Delaware corporation and our controlling shareholder, also filed a Form 12b-25, Notification of Late Filing, regarding the delayed filing of SunEdison's Annual Report on Form 10-K for the year ended December 31, 2015. SunEdison announced that its delay in filing its Form 10-K was principally due to (1) the need to complete all tasks and steps necessary to finalize the annual financial statements and the other disclosures required to be included in that filing, and (2) ongoing inquiries and investigations by the Audit Committee of its Board of Directors and its advisors relating to allegations concerning the accuracy of SunEdison's anticipated financial position based on certain issues raised by former executives and current and former employees of SunEdison (the "SUNE-Related Matters").

On March 16, 2016, SunEdison announced a further delay in filing its 10-K. This delay is principally due to the additional scope of work required from the identification by SunEdison's management of material weaknesses in its internal controls over financial reporting, primarily due to deficient information technology controls in connection with newly implemented systems (the "SUNE-Internal Control Matters"). Because of these material weaknesses, additional procedures are necessary for SunEdison's management to complete SunEdison's annual financial statements and related disclosures, and in order for SunEdison's independent registered accounting firm to finalize its audits as of December 31, 2015. SunEdison also announced that they have not completed the SUNE-Related Matters, including the investigation described above.

Due to our management services arrangement with SunEdison under the Management Services Agreement, our financial reporting and control processes rely to a significant extent on SunEdison systems and personnel. As a result, ***if there are control deficiencies at SunEdison, including with respect to the systems we utilize, it is necessary for us to assess whether those deficiencies could affect our financial reporting*** and, if so, address them to the extent necessary and appropriate prior to filing our Form 10-K.

SunEdison has informed us that they are continuing to work through the SUNE-Related matters and SUNE-Internal Control Matters and we have been assessing whether the SUNE-Related Matters and SUNE-Internal Control Matters could affect our financial statements. To date, we have not identified any material misstatements or restatements of our audited or unaudited financial statements or disclosures for any period previously reported.

Additionally, we have not yet completed all steps and tasks necessary to finalize our financial statements and other required disclosures. We currently have identified material weaknesses in internal controls over financial reporting primarily due to ineffective controls in relation to our Enterprise Resource Planning (ERP) systems and processes for validating revenue recognition. We are working to remediate these issues as promptly as practicable.

As anticipated, because the filing of our Form 10-K will be delayed beyond the 15-day extension period of Form 12b-25, on March 15, 2016 we received a notification letter

> from a Director of NASDAQ Listing Qualifications. The notification letter stated that because we have not yet filed our Form 10-K for the year ended December 31, 2015, TerraForm Power is no longer in compliance with NASDAQ Marketplace Rule 5250(c)(1), which requires timely filing of periodic reports with the SEC.

132. On this news, TerraForm stock fell $0.83, or 7.87%, to close at $9.72 on March 16, 2016.

133. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## POST-CLASS PERIOD EVENTS

134. On March 11, 2016, SunEdison announced that Wuebbels, its CFO, would resign and be replaced by incoming "chief financial officer designee" Ilan Daskal, effective upon his start with SunEdison, no later than April 4, 2016. SunEdison stated that Wuebbels would remain SunEdison's CFO until Daskal and SunEdison agreed to remove the designee title, and Wuebbels would remain President and CEO of TerraForm and Global.

135. On March 30, 2016, TerraForm announced that Wuebbels resigned from his position as President and CEO of the Company, and also resigned from his position as a director of the Board.

136. On March 31, 2016, SunEdison disclosed in a Form 8-K filed with the SEC that it received a subpoena from the DOJ, and a nonpublic, informal inquiry from the SEC, seeking information and documentation relating to, *inter alia*, intercompany transactions involving SunEdison and each of TerraForm and Global; and the previously disclosed investigations by the company's audit committee.

137. On April 14, 2016, SunEdison disclosed in a Form 8-K filed with the SEC that its audit committee, together with the aid of independent counsel and accounting and financial

advisors, identified issues with SunEdison's overly optimistic culture and its tone at the top, and identified several specific issues regarding SunEdison's cash forecasting and liquidity management practices, including that: (i) SunEdison's cash forecasting efforts lacked sufficient controls and processes; (ii) certain assumptions underlying the cash forecasts provided to the Board by SunEdison's management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted; (iii) SunEdison's management had not responded appropriately when forecasted targets were not met; and (iv) SunEdison lacked sufficient controls and processes regarding its managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis.

138. On April 18, 2016, a *Seeking Alpha* article stated that "[a]t the end of Mar-2016, SunEdison disclosed both a DOJ and SEC investigation. This followed the company's delayed 10-K filing announced at the end of Feb-2016. Yet information recently received from the SEC shows TerraForm Power, a 'yieldco' of SunEdison, was already under investigation by the SEC prior to either of these two events occurring at SunEdison. To this day, the SEC investigation of TerraForm Power, which was confirmed as on-going as of 14-Mar-2016, remains undisclosed."

139. On April 21, 2016, SunEdison and 25 affiliated entities filed bankruptcy petitions in the Bankruptcy Court for the Southern District of New York. TerraForm did not file for bankruptcy.

140. On May 10, 2016, SunEdison terminated Wuebbels. His last day of employment was June 9, 2016.

141. On May 11, 2016, TerraForm filed a Form 12b-25, Notification of Late Filing, with the SEC regarding its delayed 10-Q for the quarter ended March 31, 2016. The Company

stated that it had also not yet filed its 10-K for the year ended December 31, 2015. TerraForm stated, in part:

> As the Company has previously disclosed, due to the services we receive from SunEdison . . . under the Management Services Agreement, our financial reporting and control processes rely to a significant extent on SunEdison systems and personnel. As a result, if there are control deficiencies at SunEdison, including with respect to the systems that we utilize, it is necessary for us to assess whether those deficiencies could affect our financial reporting and related internal controls, and, if so, assess whether matters related to SunEdison's delay in its Form 10-K (including (a) SunEdison's identification of material weaknesses and additional procedures necessary to complete its annual financial statements and related disclosures and (b) the publicly disclosed findings of the investigation by SunEdison's independent directors and the related remedial plan) could affect our financial reporting and related internal controls.
>
> We currently have identified material weaknesses in internal control over financial reporting primarily due to (i) ineffective controls in relation to our Enterprise Resource Planning (ERP) systems, (ii) processes for validating revenue recognition, (iii) processing of accounts payable and general and administrative expenses, (iv) valuation of costs of projects acquired from SunEdison, and (v) controls over account reconciliations and restricted cash classifications.

142. On May 12, 2016, SunEdison filed a Form 12b-25, Notification of Late Filing, with the SEC regarding its delayed 10-Q for the quarter ended March 31, 2016. SunEdison stated that it also had not yet filed its 10-K for the year ended December 31, 2015. SunEdison stated, in part:

> The Form 10-K continues to be delayed due to the previously disclosed identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems. Because of these material weaknesses, additional procedures are necessary for management to complete the Company's annual financial statements and related disclosures, and for the finalization of the audit of the Company's annual financial statements and the effectiveness of internal controls over financial reporting as of December 31, 2015.

143. In an Order dated August 11, 2016, the Bankruptcy Court stated: "filings on the Petition Date and thereafter also raised serious questions regarding SunEdison's financial condition and the reliability of previously published financial data. According to Patrick M.

Cook, SunEdison's Vice President-Capital Markets and Corporate Finance, the SunEdison Group owed secured and unsecured funded debt in the amount of $3.832 billion and trade debt of at least $357 million. Cook also reported falling stock prices for SunEdison and the Yieldcos, recounted the details of litigation against SunEdison and repeated the issues relating to the financial statements discussed in the Forms 8-K, including the DOJ Investigation."

144. TerraForm has yet to file its 10-K for the year ended December 31, 2015, its Form 10-Q for the period ended March 31, 2016, or its Form 10-Q for the period ended June 30, 2016.

## SUMMARY OF SCIENTER ALLEGATIONS

145. Defendants each acted with scienter in that each knew or recklessly disregarded that the public statements regarding TerraForm's internal financial controls and growth strategy were false and/or misleading statements and/or failed to disclose: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement. The information in this section is a summary of the allegations detailing Defendants' scienter that are set forth more fully above.

146. Defendants' scienter is supported by the fact that Defendants were directors and senior executive officers at both TerraForm and SunEdison. For example, Defendant Chatila

was TerraForm's Chairman of the Board from the start of the Class Period until November 20, 2015 and remained a director until after the Class Period. He also served as President, CEO and a director of SunEdison during the entire Class Period. Defendant Domenech was President, CEO and a director of TerraForm from the start of the Class Period until his termination on November 20, 2016. He also served as Executive Vice President and President of SunEdison and its predecessor from as early as 2009, and was Executive Vice President of SunEdison when he was terminated on November 20, 2015. Defendant Wuebbels was a TerraForm director since 2014 and was the Company's President and CEO from November 20, 2015 until after the Class Period. He also served as SunEdison CFO and Executive Vice President during the Class Period as well as SunEdison's Chief Administrative Officer since December 2014 until after the Class Period. The two companies were inextricably interwoven.

147. Defendants' scienter is supported by the fact that it was widely known within SunEdison and TerraForm that internal financial controls at both companies suffered from material weaknesses. As to TerraForm, those material weaknesses were the result of the services provided and systems utilized by SunEdison pursuant to the Management Services Agreement. TerraForm's Director of Global Financial Planning & Analysis stated that TerraForm essentially had no internal controls over its non-GAAP compliant numbers it was reporting quarter after quarter from 2014 through the first half of 2015, and executives at all levels were fully aware of this, including the CEO (Defendant Domenech), CFO (Defendant Hernandez) and other officers. And worst of all, Defendant Chatila ordered employees to change numbers reported for revenue forecasts. SunEdison's Head of Global Field Operations stated that SunEdison's internal controls over financial reporting were "a web of chaos and confusion." As explained in detail herein, Defendants never ensured that as other companies were acquired, the disparate financial

reporting systems from the different companies could be integrated and work together with both SunEdison's and TerraForm's own reporting structure. Consequently, there were numerous errors. Employees reported that everyone knew about these systemic issues, particularly Defendants Domenech and Wuebbels.

148. Defendants' scienter is supported by the fact that (i) Domenech and Hernandez each signed repeated certifications pursuant to SOX Section 302 stating that they designed internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under their supervision. This constitutes evidence that they were intimately involved in TerraForm's internal controls over financial reporting; and (ii) Chatila and Wuebbels each signed repeated certifications pursuant to SOX Section 302, as well as SOX Section 404 regarding the effectiveness of SunEdison's internal controls over financial reporting. This constitutes evidence that they were intimately involved in SunEdison's internal controls over financial reporting.

149. Defendants Chatila and Wuebbel's shifting explanations as to how SunEdison mischaracterized the Margin Loan as "non-recourse" supports a strong inference of scienter. They initially told Deutsche Bank in a November 18, 2015 investor meeting that once SunEdison had to post additional cash collateral for the Margin Loan, it then had to "reclassify the loan from non-recourse to recourse." Later, their story changed. Chatila and Wuebbels implied that it was a late September amendment to the Margin Loan – over a month after SunEdison first had to post additional cash collateral – that changed the loan from non-recourse to recourse. Both explanations make little sense, and the fact that they changed explanations supports the inference of scienter.

150. The fact that, throughout the Class Period, Defendants Chatila and Wuebbels participated in internal calls during which SunEdison's repeated failure to pay long-overdue vendor invoices was discussed supports a strong inference of scienter.

151. Defendants Chatila, Domenech and Hernandez's scienter is supported by the fact that as SunEdison was running out of cash, Defendant Chatila put pressure on TerraForm to pay for SunEdison's expenses outside of the expansive Management Services Agreement. Defendant Domenech's top Administrative Assistant stated that TerraForm was paying for everything and Defendants Domenech and Hernandez were concerned about excessive "chargebacks" by SunEdison outside of the agreement. Defendants Domenech and Hernandez and all other executives were well aware of this issue but deferred to anything Chatila wanted them to do. TerraForm executives were concerned about whether SunEdison would succeed financially and knew that TerraForm was spending significant cash to prop up SunEdison and Chatila.

152. Defendants' scienter is supported by the fact that, in or about late October 2015, SunEdison told Defendant Hernandez that SunEdison had a short-term need for additional cash, and Defendants Domenech and Hernandez, and Perez, raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition.

153. Defendants Chatila and Wuebbel's scienter is supported by their direct involvement in the firings a month later of Defendants Domenech and Hernandez, and the overthrow of TerraForm's and Global's Corporate Governance and Conflicts Committees in order to extract the cash necessary to pay the Margin Loan – funds that SunEdison did not have. The fact that they were personally involved establishes their personal knowledge concerning the Margin Loan and SunEdison's liquidity position.

## LOSS CAUSATION

154. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. During the Class Period, Plaintiffs and the Class purchased TerraForm common stock at artificially inflated prices, and were damaged thereby when the price of TerraForm common stock significantly declined, causing investors to suffer losses when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by Defendants materialized.

155. Specifically, the statements made by Defendants were false and/or misleading and/or failed to disclose information that they knew or recklessly disregarded, including: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement. When those statements were corrected and the risks concealed by them materialized, investors suffered losses as the price of TerraForm common stock declined. As a result of the disclosure of the truth of Defendants' fraud, the price of TerraForm's common stock declined as follows:

(c) $3.87, or 21.15%, from a closing price of $18.30 per share on November 9, 2015 to a closing price of $14.43 per share on November 10, 2015; and

(d) $0.83, or 7.87%, from a closing price of $10.55 per share on March 15, 2016 to a closing price of $9.72 per share on March 16, 2016.

156. The disclosures that corrected the market price of TerraForm's common stock to reduce the artificial inflation caused by Defendants' materially false and misleading statements and omissions occurred on:

(a) November 9, 2015 when SunEdison disclosed: (i) the terms of a Goldman Sachs loan; (ii) that it had been required to deposit an additional $91 million in cash collateral on the Margin Loan in October 2015; and (iii) that it had reclassified the $740 million of debt under the Margin Loan and Exchangeable Notes from non-recourse to recourse debt.

(b) March 16, 2016 when TerraForm announced: (i) that it would further delay the filing of its Form 10-K for the year ended December 31, 2015 beyond the extended due date of March 15, 2016; (ii) that SunEdison announced a further delay in filing its Form 10-K for the year ended December 31, 2015 principally due to the additional scope of work required from the identification of material weaknesses in its internal controls over financial reporting; (iii) that due to TerraForm's Management Services Agreement with SunEdison, if there are control deficiencies at SunEdison, including with respect to the systems TerraForm utilizes, it is necessary for TerraForm to assess whether those deficiencies could affect TerraForm's financial reporting; (iv) that TerraForm has identified material weaknesses in internal controls over financial reporting; and (v) that because the filing of TerraForm's Form 10-K would be further delayed, TerraForm received a notification letter on March 15, 2016 from NASDAQ Listing Qualifications stating that TerraForm is no longer in compliance with NASDAQ Marketplace Rule 5250(c)(1) which requires timely filing of periodic reports with the SEC.

157. Accordingly, as a result of their purchases of TerraForm's publicly traded common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss and damages.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

158. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of

current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

159. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, and/or the statement was authorized or approved by Defendants who knew that the statement was materially false or misleading when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

160. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TerraForm common stock during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

161. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TerraForm common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TerraForm or its transfer agent and may

be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

162. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

163. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

164. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the Company's internal financial controls;
- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts regarding the Company's growth strategy;
- whether Defendants caused TerraForm to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the price of TerraForm common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

165. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

166. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- TerraForm common stock is traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts. Their reports were publicly available and entered the public marketplace;
- TerraForm was eligible to file registration statements with the SEC on Form S-3ASR;
- Defendants regularly communicated with public investors by means of established market communication mechanisms, including through dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
- Plaintiffs and members of the Class purchased, acquired and/or sold TerraForm common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

167. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

168. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

169. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

171. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TerraForm common stock; and (iii) cause Plaintiffs and other members of the Class to purchase

or otherwise acquire TerraForm common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

172. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for TerraForm securities. Such reports, filings, releases and statements were materially false and misleading in that they misrepresented the truth and failed to disclose material adverse information which they knew or recklessly disregarded – (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

173. By virtue of their positions at TerraForm, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative,

Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

174. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As Chairman of the Board or director or senior executive officers of TerraForm, Defendants had knowledge of the details of TerraForm's internal affairs.

175. Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of TerraForm. As Chairman of the Board or director or senior executive officers of a publicly-held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TerraForm's business, operations, finances and internal financial controls. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TerraForm common stock was artificially inflated throughout the Class Period. In ignorance of the aforementioned adverse information stated above which was concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired TerraForm common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

176. During the Class Period, TerraForm common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TerraForm common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of TerraForm common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of TerraForm common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

177. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating materially false and/or misleading statements, and/or failed to disclose information that they knew or recklessly disregarded, including: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the

Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act**
**Against Chatila, Wuebbels, Domenech and Hernandez**

179. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180. During the Class Period, Defendants Chatila, Wuebbels, Domenech, and Hernandez participated in the operation and management of TerraForm, and conducted and participated, directly and indirectly, in the conduct of TerraForm's business affairs. Because of their positions, they knew or recklessly disregarded the adverse non-public information: (i) that TerraForm's Management Services Agreement with SunEdison exposed TerraForm to risks associated with SunEdison's woefully inadequate internal financial controls; and consequently, TerraForm lacked effective internal financial controls which resulted in the Company being incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TerraForm was admittedly dependent for all essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity posing significant risk to TerraForm's stated growth strategy; and (iii) that due to its liquidity crisis, SunEdison was forcing TerraForm to improperly expend its own cash and

resources to fund SunEdison's operations well beyond the requirements of the Master Services Agreement.

181. As TerraForm's Chairman of the Board (Defendant Chatila), President, CEO and board member (Defendants Domenech and Wuebbels) and CFO (Defendant Hernandez) of a publicly owned company, each had a duty to disseminate accurate and truthful information with respect to TerraForm's business, operations, internal financial controls, and financial condition, and to correct promptly any public statements issued by TerraForm which had become materially false or misleading.

182. Because of their positions of control and authority, Defendants Chatila, Wuebbels, Domenech and Hernandez were able to, and did, control the contents of the various reports, press releases and public filings which TerraForm disseminated in the marketplace during the Class Period concerning TerraForm's business, operations, internal financial controls, and financial condition. Throughout the Class Period, such Defendants exercised their power and authority to cause TerraForm to engage in the wrongful acts complained of herein. Defendants Chatila, Wuebbels, Domenech, and Hernandez therefore were "controlling persons" of TerraForm within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TerraForm securities.

183. Each of the Defendants Chatila, Wuebbels, Domenech, and Hernandez therefore acted as a controlling person of TerraForm. By reason of their positions at TerraForm, each of them had the power to direct the actions of, and exercised the same to cause, TerraForm to engage in the unlawful acts and conduct complained of herein. Each of them exercised control over the general operations of TerraForm and possessed the power to control the specific

activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

184. By reason of the above conduct, Defendants Chatila, Wuebbels, Domenech, and Hernandez are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TerraForm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 26, 2016

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

/s/ *Daniel S. Sommers*
Steven J. Toll (Maryland Bar No. 15824)
Daniel S. Sommers (Maryland Bar No. 15822)
S. Douglas Bunch
1100 New York Ave. N.W.
East Tower, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Jennifer Banner Sobers
J. Alexander Hood II (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
bszydlo@pomlaw.com
jbsobers@pomalw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email: peretz@bgandg.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com
sfuks@rosenlegal.com

***Attorneys for Plaintiffs and the Proposed Class***