**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: SUNEDISON, INC. SECURITIES LITIGATION** | **Case Nos. 1:16 MD 2742 (PKC) (AJP)** |
| | **1:16 mc 2742 (PKC) (AJP)** |
| This Document Applies To: | |
| ***Chamblee, et al. v. TerraForm Power, Inc., et al.*, 1:16-cv-08039-PKC** | **JURY TRIAL DEMANDED** |

## SECOND AMENDED SECURITIES CLASS ACTION COMPLAINT

**POMERANTZ LLP**
Jeremy A. Lieberman
Brenda Szydlo
Jennifer Banner Sobers
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
bszydlo@pomlaw.com
jbsobers@pomlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

[*Additional Counsel on Signature Page*]

# TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................1

JURISDICTION AND VENUE ...........................................................................11

PARTIES ............................................................................................................12

NON-PARTIES ...................................................................................................14

FACTUAL BACKGROUND ...............................................................................15

TERP AND SUNEDISON WERE ESSENTIALLY   OPERATED BY THE SAME
PEOPLE AND ACTED AS ONE COMPANY ......................................................17

IT WAS WIDELY KNOWN WITHIN SUNEDISON AND TERP THAT
SUNEDISON'S INTERNAL CONTROL OVER FINANCIAL REPORTING WAS
WOEFULLY INADEQUATE, AND THEREBY RENDERED TERP'S INTERNAL
CONTROL OVER FINANCIAL REPORTING MATERIALLY DEFICIENT AND THE
COMPANY INCAPABLE OF PRODUCING ACCURATE FINANCIAL
STATEMENTS.......................................................................................................20

    The Exchange Act Requires Issuers to Create And Maintain A System of Internal
    Controls...........................................................................................................20

    TERP's Internal Control Over Financial Reporting During The Class Period.....................22

    SunEdison's Internal Control Over Financial Reporting During The Class Period ..............25

DEFENDANTS KNEW, BUT FAILED TO DISCLOSE, THAT SUNEDISON, ON
WHICH TERP WAS ADMITTEDLY DEPENDENT ON FOR DROP   DOWN
ACQUISITIONS, WAS MISREPRESENTING AND OMITTING  MATERIAL FACTS
CONCERNING ITS DEBT AND LIQUIDITY WHICH  CAUSED SIGNIFICANT
RISK TO TERP'S GROWTH STRATEGY AT THAT TIME.........................................32

DEFENDANTS FAILED TO DISCLOSE THAT SUNEDISON FORCED TERP TO
PAY FOR EXPENSES AND PREPAYMENTS THAT TERP WAS NOT OBLIGATED
TO PAY WHICH FURTHER MASKED SUNEDISON'S LIQUIDITY CRISIS AND
CAUSED SIGNIFICANT RISK TO TERP'S GROWTH STRATEGY AT THE TIME ...............37

THE RELATIONSHIP BETWEEN SUNEDISON AND ITS   YIELDCOS FOREVER
CHANGED MID-YEAR 2015 .................................................................................39

SunEdison's Liquidity Crisis Spirals Out Of Control And  The Yieldcos Grow Tired Of Coming To The Rescue ........................................................................39

The Friday Night Massacre ........................................................................47

MATERIALLY FALSE AND MISLEADING  STATEMENTS ISSUED DURING THE CLASS PERIOD ........................................................................48

THE TRUTH GRADUALLY EMERGES ........................................................................64

POST-CLASS PERIOD EVENTS ........................................................................69

LOSS CAUSATION ........................................................................75

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................................77

PRESUMPTION OF RELIANCE ........................................................................79

COUNT I ........................................................................80

COUNT II ........................................................................84

PRAYER FOR RELIEF ........................................................................86

DEMAND FOR TRIAL BY JURY ........................................................................87

Lead Plaintiffs Clemens Schlettwein and Jerome Spindler and Plaintiff John Chamblee (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TerraForm Power, Inc. ("TERP" or the "Company") and SunEdison, Inc. ("SunEdison"), interviews with former TERP and SunEdison employees, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired TERP securities between July 18, 2014 and March 15, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against TERP and certain former directors and senior executive officers of the Company.

2.      TERP, headquartered in Bethesda, Maryland, was formed by its controlling shareholder, SunEdison, to own and operate solar and wind generation assets acquired or "dropped down" primarily from SunEdison, but also from unaffiliated third parties.  TERP's first

day of trading after its initial public offering ("IPO") was July 18, 2014.  As of February 20, 2015, its portfolio consisted of solar and wind projects located in the United States, Canada, the United Kingdom, and Chile.

3.      During the Class Period, the Company did not have any employees.  SunEdison provided TERP with managerial and administrative services, including accounting, audit, information technology, financial back-office and cash-management functions pursuant to a Management Services Agreement between the Company and SunEdison (the "Management Services Agreement").

4.      Additionally, throughout the Class Period, TERP shared significant overlapping management and Board members with SunEdison (and SunEdison's other affiliates.)  SunEdison determined and paid TERP management's compensation, and TERP's management was controlled by, and beholden to, SunEdison.

5.      Through its stock ownership, Board and managerial control, and TERP's reliance on SunEdison for drop down acquisitions and essential services under the Management Services Agreement, SunEdison exercised unfettered control over the business and affairs of TERP (except for the authority delegated to the Corporate Governance and Conflicts Committee of TERP's Board of Directors to review and authorize related-party transactions).

6.      While TERP and SunEdison were separate companies for financial reporting purposes, their relationship was symbiotic.  Practically speaking, they operated as one and the same, with both companies being led by the same individual, the hard-charging Ahmad Chatila ("Chatila"), TERP's Chairman, and SunEdison's Chief Executive Officer ("CEO"), President and director, who "everyone reported to."  The individuals running TERP were directly associated with, regularly meeting and cooperating with, and obeying instructions from, their

colleagues at SunEdison.  Employees were told that it was "one company with one set of values" to the extent that Chatila threatened to terminate any employee who treated or viewed the two companies as distinct.

7.     Unbeknownst to investors, but known to defendants, those "values" included woefully inadequate internal control over financial reporting at SunEdison and TERP, and liquidity problems at SunEdison that caused significant risk to TERP's growth strategy, that were further masked by SunEdison forcing TERP to repeatedly funnel cash to it.

8.     This action involves a series of materially false and misleading statements and material omissions by defendants.  For example, although widely known within TERP and SunEdison, TERP failed to disclose that SunEdison's internal control over financial reporting was woefully inadequate, thereby rendering TERP's internal control over financial reporting hopelessly deficient and the Company incapable of producing accurate financial statements. This is because TERP and SunEdison were operated by the same people and were essentially the same company.

9.     SunEdison and TERP, which acquired hundreds of electricity generating facilities across the world, were unable to tell how their assets were performing financially because different and incompatible accounting systems were used for each, resulting in what was called "a nightmare."   Carlos Domenech Zornoza ("Domenech"), TERP's CEO, and SunEdison's Executive Vice President, was well aware that the Company should have an integrated system to monitor its ever growing and unwieldy portfolio of assets, but he flat out ignored this.

10.     Not only were generally accepted accounting principles ("GAAP") routinely ignored, but there were no internal controls over non-GAAP reporting measures.  Executives and employees of all levels – including Domenech and Alejandro Hernandez ("Hernandez"), TERP's

Chief Financial Officer ("CFO"), – were well aware of this.  Chatila, who "everybody feared" led weekly calls attended by both TERP and SunEdison officials, and demanded that employees change numbers reported for revenue forecasts, telling them that he did not care what was possible and to just "put down the numbers."

11.     SunEdison had no coherent system of internal financial reporting.  Its financial results have been described as "bastardized" and lacking "a true version of the truth."  In fact it was common for SunEdison vendors to believe – correctly – that they were owed millions of dollars according to the terms of their contract even though SunEdison's systems showed these vendors were owed hundreds of thousands of dollars.

12.     Rather than utilize appropriate systems, SunEdison had its employees manually enter financial data into an excel spreadsheet leading to massive errors described as a "web of chaos and confusion."  As a result, SunEdison's creditors were massively underpaid, and there were multi-million dollar mistakes on projects.

13.     SunEdison violated basic internal control principles by allowing employees with minimal security clearance to access its reporting system.  Data was often erroneously entered and sometimes deliberately falsified to make projects look more favorable, at the behest of the pressure imposed by Chatila.

14.     Internal control problems were reported to supervisors and employees were told that fixing these problems was "priority number 1" and that the executive team, including Brian Wuebbels ("Wuebbels"), SunEdison's CFO and TERP director, was in the process of dealing with it.

15.     Additionally, defendants knew, but failed to disclose, that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for all

essential services and drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity which caused significant risk to TERP's growth strategy at the time.

16.     Defendants knew that SunEdison's severe liquidity problems deepened into a full-blown crisis as time went on.  This issue was exemplified by systemic and ongoing problems paying vendors for basic utilities and necessary services, including telephone and electricity bills. SunEdison even failed to pay vendors whose services were critical.  When SunEdison did pay its bills, SunEdison did so by improperly shuffling around cash from dedicated project funds, further jeopardizing the success of those projects.   SunEdison's liquidity problems posed significant risk to TERP's growth strategy at the time.

17.     Several confidential witnesses have reported that the payment problems were so well known that "even the janitor" knew that SunEdison never had cash.  According to former SunEdison employees, project managers would be reduced to paying bills with their personal credit cards, and requesting reimbursement from SunEdison.  SunEdison's standard procedure was to pay vendors in the priority of which vendor was refusing to perform work, and bills to vendors were regularly overdue by as much as 180 days.  Defendants were well aware of this as overdue payments to vendors were discussed during weekly meetings and Wuebbels himself had to approve or sign off on decisions to distribute the funds necessary to pay vendors.

18.     Chatila addressed SunEdison's problems paying vendors in quarterly employee "all hands" calls which included TERP personnel.  While he promised to fix what he termed as the "broken system," he ranted to employees that they could go work for a company that grew slowly (and thus had the cash to timely pay its vendors) or could work for SunEdison, which was

a big, fast growth company.  Chatila added that these were the sacrifices that SunEdison would make for growth.

19.     By the first quarter of 2015, SunEdison lacked the cash to sustain its acquisition-driven, yieldco-dependent business model.  In January 2015, SunEdison took on massive debt through the sale of $337 million in 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 and a $410 million two-year margin loan in order to fund a new large acquisition.  In presentations and SEC filings, SunEdison, Chatila and Wuebbels falsely classified the notes and the margin loan as non-recourse debt, but in reality, it was disclosed months later in mid-November 2015 in its public filing that this debt was actually recourse debt.  This caused highly significant repercussions for TERP's stock as TERP repeatedly told the market that the Company's growth depended on SunEdison's ability to continue to drop down new acquisitions into TERP.

20.     Defendants Chatila and Wuebbels also falsely reassured the market on August 6, 2015 during a joint SunEdison/TERP Q2 2015 Earnings Conference Call that SunEdison had "greater than $1 billion" available, and Defendant Hernandez, during that same call, stated:  "In addition to our balance sheet liquidity we also benefit from incremental liquidity provided by the warehouse facilities we have placed in order with our sponsor SunEdison and our infrastructure partners."  "In addition to maintaining significant balance sheet liquidity, the warehouses [credit facility] we have developed with SunEdison and our infrastructure partners provide another important tool to fund [TERP's] growth with significant financial flexibility."  This led analysts to comment positively that any liquidity concerns regarding SunEdison "appear [] more of a perception than a reality."  However, after the end of the Class Period, the market learned in a March 28, 2016 *Wall Street Journal* article entitled "SEC Investigating SunEdison's Disclosures

to Investors About Its Liquidity" that the $1 billion included a $500 million warehouse credit facility "that SunEdison couldn't access" and should never have been included in SunEdison's liquidity calculations.

21. Furthermore, as explained below, defendants knew, but failed to disclose, that SunEdison forced TERP to pay for expenses that SunEdison was obligated to pay, and that TERP was making millions of dollars in prepayments to SunEdison for drop down acquisitions, although not required to do so and without any discount or consideration to TERP. These prepayments by TERP further masked SunEdison's liquidity crisis which, again, caused significant risk to TERP's growth strategy at that time.

22. Because SunEdison was running out of funds and scrambling for ways to raise cash, defendant Chatila put pressure on TERP to pay for various expenses that SunEdison was obligated to pay. TERP executives were well aware of the issue, and Defendants Domenech and Hernandez were concerned about the excessive nature of these "chargebacks," but deferred to anything Chatila wanted them to do. At the end of a month or quarter, there would be a settling up period, and TERP would charge the expenses back to SunEdison. TERP executives were concerned about whether SunEdison would succeed financially and knew that TERP was spending significant cash to prop up SunEdison and Chatila. These payments by TERP further masked SunEdison's liquidity crisis which posed a significant risk to TERP's growth strategy at that time.

23. SunEdison was so desperate for cash that, at SunEdison's request, TERP would also regularly prepay SunEdison on projects to be dropped down to TERP. SunEdison was not contractually entitled to the prepayments, and TERP did not receive discounts or any form of consideration for making the prepayments. The prepayments would eventually be taken out of

the final price for the acquisition. SunEdison was constantly in need of cash and the prepayments were especially prevalent near the end of the quarter, when they would be used to burnish SunEdison's cash position. One confidential witness estimates that TERP would make between $25-50 million in prepayments every quarter. The prepayments were also confirmed by another confidential witness who stated that even though a project wasn't quite ready, TERP would make the prepayment because SunEdison needed the money to wrap up the project. TERP's prepayments further masked SunEdison's liquidity crisis which caused significant risk to TERP's growth strategy at that time.

24. By the fall of 2015, Defendants Domenech, Hernandez, and Francisco Perez Gundin ("Perez"), the Chief Operating Officer ("COO") of TERP, SunEdison, and TerraForm Global Inc. ("Global"), were fed up with SunEdison's lies to the market and raised concerns to Defendant Chatila and other members of SunEdison's Board about the coherence and transparency of presentations that had been recently made by Chatila and Wuebbels about SunEdison's actual and prospective cash holdings and liquidity.

25. The situation finally came to a head on November 18, 2015 when the Corporate Governance and Conflicts Committees of both TERP and Global, along with their legal and financial advisors, and Defendants Domench and Gundin, reviewed a variety of potential alternatives for making $100 million available to SunEdison, but ultimately concluded that they could not execute any of these transactions in the time period requested by SunEdison and because SunEdison would not agree to governance changes as part of any deal.

26. In retaliation, on November 20, 2015, SunEdison reconstituted TERP and Global's Boards and dispensed with their management.

27.     That same day, Global agreed to advance $231 million to SunEdison (to be paid in two installments – a first installment of $150 million, and a second of $81 million to be paid within three business days) purportedly in order to facilitate SunEdison's completion of a certain transaction and to secure a transfer of SunEdison's equity interests in these projects to Global in the near term.

28.     Within minutes of Global's approval of the transaction, Defendant Wuebbels caused $150 million to be wired from Global's bank account to SunEdison.  Instead of using the $150 million for purposes of the transaction, SunEdison used in excess of $90 million of the funds extracted from Global to pay off its margin loan mere minutes before a payment deadline that same day.

29.     As the truth concerning TERP's deficient internal control over financial reporting, and the significant risks caused by SunEdison's liquidity crisis gradually emerged, TERP's stock price tumbled.

30.     Investors first got wind of problems on October 5, 2015, when SunEdison announced that it was laying off 15% of its workforce and taking restructuring charges of $30 to $40 million for the third quarter of 2015 through the first quarter of 2016.  The following day, the *Wall Street Journal* reported that SunEdison had failed to make a required $400 million upfront payment for a roughly $700 million planned acquisition.  A number of prominent hedge funds sold their SunEdison positions as analysts downgraded the stock.

31.     Then, on November 9, 2015, SunEdison revealed devastating facts about its debt and liquidity which contradicted its prior statements that it would be able to meet its capital needs for the year.  On that day, SunEdison revealed that: (i) in July 2015, it had taken out a $169 million one-year loan at an effective rate of interest of 15% – contradicting its August 6,

2015 representations that it had enough cash to fund its operations for 12 months; (ii) it had to deposit an additional $91 million in cash on the margin loan; and (iii) it had reclassified the $740 million in debt under the margin loan and exchangeable notes from non-recourse to recourse debt.  These announcements caused TERP's stock to fall $3.87, or $21.15% to close at $14.43.

32.     On February 29, 2016 both TERP and SunEdison announced that they were delaying the filing of their 2015 Form 10-K's, with TERP citing only "the need to complete all steps and tasks necessary to finalize the Company's annual financial statements and other disclosures required to be in the filing."

33.     TERP and SunEdison then extended the delays again on March 16, 2016.

34.     On that day, SunEdison announced that it had found material weaknesses in its internal controls, and would further delay the filing of its 2015 Form 10-K.  TERP also announced that it found material weaknesses in its internal controls, and further stated that its financial reporting and control depended substantially on SunEdison's systems and personnel, and that "if there are control deficiencies at SunEdison, including with respect to the systems we utilize, it is necessary for us to assess whether those deficiencies could affect our financial reporting."

35.     On this news, TERP stock fell $0.83 or 7.87% to close at $9.72 on March 16, 2016, the last day of the Class Period.

36.     After the close of the Class Period, on March 31, 2016, SunEdison announced that it was being investigated by both the SEC and the Department of Justice ("DOJ") for, among other things, transactions with TERP and Global.  Although undisclosed by TERP, it has been reported that information received from the SEC confirms that TERP was already under investigation by the SEC prior to either of these two events occurring at SunEdison.

37.     On April 21, 2016, SunEdison and 25 affiliated entities filed bankruptcy petitions in the Bankruptcy Court for the Southern District of New York.  TERP, however, did not file for bankruptcy.

38.     As a result of the foregoing misconduct, Plaintiffs and other Class members suffered economic loss and damages in excess of $300 million.

## JURISDICTION AND VENUE

39.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

40.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

41.     Venue is proper in the District of Maryland pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as the Company is headquartered in that District. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in that District.

42.     Pursuant to the October 4, 2016 Order of the United States Judicial Panel on Multidistrict Litigation, this action was transferred to the Southern District of New York for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

43.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

44.     Lead Plaintiff Clemens Schlettwein ("Schlettwein") acquired TERP common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

45.     Lead Plaintiff Jerome Spindler ("Spindler") acquired TERP common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

46.     Plaintiff John Chamblee ("Chamblee") acquired TERP common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

47.     Plaintiffs Schlettwein, Spindler and Chamblee are collectively referred to herein as "Plaintiffs."

48.     Defendant TERP is incorporated in Delaware, and the Company's principal executive offices are located at 7550 Wisconsin Avenue, 9th Floor, Bethesda, Maryland 20814. It was formed under the name SunEdison Yieldco, Inc. on January 15, 2014, as a wholly owned indirect subsidiary of SunEdison.  The name change to its current name became effective on May 22, 2014.

49.     Defendant Chatila was TERP's Chairman of the Board from January 2014 to November 20, 2015 and remained a director until May 26, 2016.  He was also President, CEO, and a director of SunEdison and its predecessor from March 2009 to June 22, 2016.  He also served as Chairman of Global, an indirect subsidiary of SunEdison, until November 20, 2015, and remained a director until May 26, 2016.

50.     Defendant Domenech was President, CEO, and a director of TERP from January 2014 until his termination on November 20, 2015.  Domenech also served as Executive Vice President and President of SunEdison and its predecessor from as early as November 2009, and was Executive Vice President of SunEdison when he was terminated on November 20, 2015.  He also held management positions at other SunEdison affiliates, including Global where he was CEO since February 2015, and a director since Global's formation in September 2014, until his termination on November 20, 2015; and SunEdison Capital, LLC where he was President from March 2013 to January 2014.  Domenech was controlled by, and beholden to, SunEdison.  Domenech's services to TERP were provided in accordance with the Management Services Agreement, and SunEdison determined and paid Domenech's compensation.

51.     Defendant Wuebbels was a TERP director since January 2014, and the Company's President and CEO from November 20, 2015 until his resignation from the Company on March 30, 2016.  Wuebbels held numerous positions at SunEdison and its predecessor since 2007, and served as SunEdison's CFO and Executive Vice President since May 2012, and Chief Administrative Officer since December 2014, until his termination in May 2016.  He also served as CEO and President of Global from November 20, 2015 until his resignation from Global on March 30, 2016.  Wuebbels was controlled by, and beholden to, SunEdison.  Wuebbels' services were provided to TERP in accordance with the Management Services Agreement and SunEdison determined and paid Wuebbels' compensation.

52.     Defendant Hernandez served as the Company's Executive Vice President and CFO from September 17, 2014 until his termination on November 20, 2015.  He also served as Global's Executive Vice President and CFO from October 9, 2015 until his termination on November 20, 2015.  He reported directly to Domenech at TERP (and Global).  Hernandez was

an employee of SunEdison, and was controlled by, and beholden to, SunEdison.  His services were provided to TERP in accordance with the Management Services Agreement, and SunEdison determined and paid Hernandez's compensation.

53.     Defendant Perez, also known as Pancho, was a TERP director from January 2014 until November 20, 2015, and served as TERP's COO and Executive Vice President from January 2014 to January 14, 2016.  He reported directly to Domenech at TERP.  He also served as COO and Executive Vice President of SunEdison from April 2015 to January 8, 2016, and Global director and COO until November 20, 2015.  Perez was controlled by, and beholden to, SunEdison.  Perez's services were provided to TERP in accordance with the Management Services Agreement and SunEdison determined and paid Perez's compensation.

54.     Defendants TERP, Chatila, Wuebbels, Domenech, Hernandez, and Perez are collectively referred to herein as "Defendants."

## NON-PARTIES

55.     Non-party Rebecca Cranna ("Cranna") is TERP's Executive Vice President and CFO since November 22, 2015.  She also serves as SunEdison's Senior Vice President and CFO, Global Asset Management, since September 2014.  She also serves as CFO of Global since November 22, 2015.  Cranna is controlled by, and beholden to, SunEdison.  During the Class Period, Cranna's services were provided to TERP in accordance with the Management Services Agreement and SunEdison determined and paid her compensation.

56.     Non-party Sebastian Deschler ("Deschler") is TERP's Senior Vice President, General Counsel, and Secretary since January 2014.  He previously served as SunEdison's Vice President and head of Legal, EMEA, and Latin America.  During the Class Period, Deschler's

services were provided to TERP in accordance with the Management Services Agreement and SunEdison determined and paid his compensation.

57.     Non-party Martin Truong ("Truong") served as a TERP director and SunEdison's Senior Vice President, General Counsel, and Secretary throughout the Class Period.

58.     Non-party Peter Blackmore ("Blackmore") was a SunEdison director until November 20, 2015.  On that day, he resigned from the SunEdison Board and was immediately installed at SunEdison's direction as the Chairman of the Board of both TERP and Global.

59.     Non-party Jack Jenkins-Stark ("Jenkins-Stark") is a TERP director since November 20, 2015.

60.     Non-party Christopher Compton ("Compton") is a TERP director since November 20, 2015.

61.     Non-party Mark Florian ("Florian") was a TERP director from the beginning of the Class Period until November 20, 2015.

62.     Non-party Mark Lerdal ("Lerdal") was a TERP director from the beginning of the Class Period until November 20, 2015.

## FACTUAL BACKGROUND

63.     TERP is headquartered in Bethesda, Maryland.  Its first day of trading after its IPO was July 18, 2014, and on July 23, 2014, the Company closed its IPO.  The IPO raised net proceeds of approximately $534 million.  Its stock trades on the NASDAQ under the ticker symbol "TERP."

64.     TERP owns and operates solar and wind generation assets.  As of February 20, 2015, its portfolio consisted of solar and wind projects located in the United States, Canada, the United Kingdom, and Chile.

15

65.     TERP is a dividend growth-oriented company sometimes referred to as a yieldco, which was formed by its controlling shareholder, SunEdison, to own and operate clean power generation assets acquired or dropped down primarily from SunEdison but also from unaffiliated third parties.

66.     During the Class Period, SunEdison beneficially owned all of TERP's outstanding Class B common stock.  Each share of outstanding Class B common stock entitled SunEdison to ten votes on all matters presented to TERP's stockholders, such that SunEdison held a majority of TERP's combined voting power of TERP's stockholders.  As long as it held a majority of TERP's voting power, SunEdison had power to appoint all of TERP's directors and also had the right to expand the size of the Board and designate one or two new directors to TERP's Board.

67.     Throughout the Class Period, the Company did not have any employees. SunEdison provided TERP with managerial and administrative services, including accounting, audit, information technology, financial back-office and cash-management functions pursuant to the Management Services Agreement.  As such, all of the personnel who managed TERP's operations were employees of SunEdison and their services were provided to TERP pursuant to the Management Services Agreement.  SunEdison determined and paid TERP management's compensation, and TERP's management was controlled by, and beholden to, SunEdison.

68.     Through its stock ownership, Board and managerial control, and TERP's reliance on SunEdison for drop down acquisitions and essential services under the Management Services Agreement, SunEdison exercised unfettered control over the business and affairs of TERP (except for the authority delegated to the Corporate Governance and Conflicts Committee of TERP's Board of Directors to review and authorize related-party transactions).

## TERP AND SUNEDISON WERE ESSENTIALLY
## OPERATED BY THE SAME PEOPLE AND ACTED AS ONE COMPANY

69.     During the Class Period, there was significant overlap of TERP and SunEdison's management and Board members.  For example, (i) Chatila was TERP's Chairman of the Board from January 2014 to November 2015, and remained a director throughout the Class Period.  He also served as President, CEO and a director of SunEdison prior to and throughout the Class Period; (ii) Domenech was President, CEO, and a director of TERP from January 2014 until his termination on November 20, 2015.  Domenech also served as Executive Vice President and President of SunEdison and its predecessor from as early as November 2009, and was Executive Vice President when he was terminated on November 20, 2015; (iii) Wuebbels was TERP's President and CEO from November 20, 2015 until his resignation after the Class Period, and was also a TERP director prior to and throughout the Class Period.  He also served as SunEdison's CFO and Executive Vice President since May 2012 and its Chief Administrative Officer since 2014 until his termination in May 2016; (iv) Perez was a director from January 2014 until November 20, 2015, and served as Executive Vice President and COO from January 2014 to January 14, 2016.  He also served as COO and Executive Vice President of SunEdison from April 2015 to January 8, 2016; (v) Cranna served as TERP's Executive Vice President and CFO of since November 22, 2015, and SunEdison's Senior Vice President and CFO of Global Asset Management since 2014; and (vi) Truong served as a TERP director and SunEdison's Senior Vice President, General Counsel, and Secretary prior to and throughout the Class Period.

70.     According to a number of former employees, Chatila effectively ran everything and made all major decisions at both SunEdison and TERP.  Defendant Domenech's top Executive Administrative Assistant from July 2014 to September 2015 stated that Chatila was everyone's boss.  "Ahmad ran everything."  "They all effectively reported to Ahmad."  "There

17

was constant communication with Ahmad."  Typically, there was a weekly telephone conference call on Wednesdays led by Chatila with Wuebbels, Domenech, Perez, Truong and other SunEdison executives.  There was also a weekly telephone conference call on Mondays led by Domenech with Hernandez, Perez, Deschler, Cranna and other TERP executives.

71.     TERP and SunEdison occupied a number of floors in the same building in TERP's headquarters in Bethesda, Maryland.   According to one Executive Assistant who reported to Defendants Domenech and Hernandez and then later to CFO Cranna from November 2015 to March 2016, TERP and SunEdison were intricately interwoven through their staff and operations.  She never knew whether any given person worked for TERP or SunEdison.  She regularly saw SunEdison executives meeting with TERP executives during her tenure at the Company and observed a revolving door between the two companies.

72.     Defendant Domenech's top Executive Administrative Assistant stated that "[e]verybody was interconnected with everyone else."  "It was very difficult to discern who worked for whom."  "The floors were intermingled" and "SunEd legal sat next to TERP legal." "It was all mixed together."

73.     A SunEdison finance assistant from June 2015 to November 2015 stated that the two companies shared the same office space and "[i]t was really difficult to understand the difference" between the two companies."  "All the employees [of both companies] were right there."  Although she worked directly for SunEdison's Vice President/Corporate Controller, she sat side by side with TERP employees.

74.     A TERP and SunEdison Director of Global Financial Planning & Analysis from August 2014 to May 2015 (the "Director of Global Financial Planning & Analysis") stated that the floors of TERP's headquarters were confusingly mixed with workers for each company.

Meetings routinely occurred with no concern over who worked where. "SunEdison was handling all of the back-office functions for TERP," but "they were the same company." "They tried to put on a façade where it was separate," but "absolutely – they were the same company." "Just look at the officers, the Board of directors." "They were the same people." The people running TERP were directly associated with, regularly meeting and cooperating with, and obeying instructions from, their colleagues at SunEdison.

75.     Domenech's top Executive Administrative Assistant stated that SunEdison, under Chatila's leadership, and TERP, participated in an effort to inspire employees of both companies to cooperate on all levels. "There was the one company cultural initiative." Throughout TERP's and SunEdison's offices, there were posters on "all the walls" urging workers in both companies to recognize "that we're one company with one set of values." She thought it was a bit odd as if two companies with separate finances, theoretically, should always behave as one. This was the culture at TERP and SunEdison.

76.     Another SunEdison employee from July 2013 until May 2016, first as Senior Manager (July 2013 to September 2014), then as Director of Corporate Development (from September 2014 to March 2016) ("Director of Corporate Development"), and finally as Chief of Staff of the Finance Department (March 2016 to May 2016), stated that Chatila, during an employee Town Hall meeting, strongly stated his desire for everyone employed to consider SunEdison and TERP as one company or face a severe consequence – meaning termination. Chatila did not want to perpetuate the idea that the two companies operated independently.

**IT WAS WIDELY KNOWN WITHIN SUNEDISON AND TERP THAT
SUNEDISON'S INTERNAL CONTROL OVER FINANCIAL REPORTING WAS
WOEFULLY INADEQUATE, AND THEREBY RENDERED TERP'S INTERNAL
CONTROL OVER FINANCIAL REPORTING MATERIALLY DEFICIENT AND THE
COMPANY INCAPABLE OF PRODUCING ACCURATE FINANCIAL STATEMENTS**

### The Exchange Act Requires Issuers to Create And Maintain A System of Internal Controls

77.    The Exchange Act requires issuers like TERP to keep books and records setting out the transactions it engages in.  Further, an issuer's system of internal controls requires that transactions be recorded as necessary to both prepare financial statements and compare transactions with assets at reasonable intervals.  Specifically, the Exchange Act requires issuers to:

> (**A**) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (**B**) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
>
> * * *
>
> > (**ii**) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; [and]
> >
> > * * *
> >
> > (**iv**) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences […]

15 U.S.C. §78m(b)(2)(b).

78.    A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations.  It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains

adequate books and records.  This is made clear in SEC regulations as well as by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control—Integrated Framework* (the "COSO Report").

79.     The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the "effectiveness and efficiency of operations, reliability of financial reporting, [and] compliance with applicable laws and regulations."  More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

80.     The COSO Report requires that financial statements prepared for external purposes be "fairly presented in conformity with generally accepted or other relevant and appropriate accounting principles and regulatory requirements for external purposes." Consistent with generally accepted accounting principles, the COSO Report defines "fair presentation" as the following:

(a)     the accounting principles selected and applied have general acceptance;

(b)     the accounting principles are appropriate in the circumstances;

(c)     the financial statements are informative of matters that may affect their use, understanding and interpretation; and

(d)     the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.

81.     The COSO Report describes internal control as "consist[ing] of five interrelated components" that "are derived from the way management runs a business, and are integrated with the management process."  The five components of an internal control framework that are needed to enable a business to achieve its objectives are: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

82.     Under both the Exchange Act and the COSO Report, maintaining adequate internal controls includes maintaining books and records setting out contemporaneous records of the transactions TERP engaged in.

83.     SEC rules also require management to evaluate a company's internal controls and disclose *every* material weakness they are aware of.  *See Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 68 Fed. Reg. 36636, 36639 (June 18, 2003).

**TERP's Internal Control Over Financial Reporting During The Class Period**

84.     While TERP disclosed the existence of the Management Services Agreement which stated that SunEdison agreed to provide *all* essential services, including management, administrative, legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources and procurement to the Company, TERP shareholders had no knowledge that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thereby rendered TERP's internal control over financial reporting hopelessly deficient and the Company incapable of producing accurate financial statements.  This is because TERP and SunEdison were operated by the same people and were essentially the same company, as discussed above.

85.     According to the Director of Global Financial Planning & Analysis, TERP was a company in total disarray with an inability to assess what it owned and how those assets were performing or could perform.

86.     TERP acquired hundreds of electricity-generating facilities in North America and all over the world, each one of which had been operating using a different accounting system managed with different and incompatible accounting software including Oracle, SAP, Microsoft, etc.  As a result, the Director of Global Financial Planning & Analysis and his colleagues were severely challenged to assess or quantify how TERP's assets were actually performing financially.  "Those fundamental issues caused us major problems trying to figure out what was happening."  "It was a nightmare."

87.     When he tried to advocate to his supervisor, Tom Lowe, the Senior Director of Global Financial Planning & Analysis, and to Defendant Domenech, TERP's CEO and President, that the Company should pursue an integrated accounting system to monitor its huge and growing portfolio of renewable energy assets, they ignored his advice.

88.     Part of the Director of Global Financial Planning & Analysis' regular duties included reviewing the annual budgets coming from hundreds of electricity-generating installations acquired by the Company.  These budgets, however, were frequently inaccurate, and produced from boilerplate functions of the particular software being used at a particular facility. For example, if the materials budget for a project was $1 million and $1.5 million was spent, he would have to pull materials expenditures from several different systems to determine why the project went over budget.  Each of them had different ways of categorizing the financial results. The same process had to be conducted, with much larger scope, to create financial statements. The Director of Global Financial Planning & Analysis and other TERP/SunEdison employees

23

never knew where anything was.  "Budgets were like a mock-up trial budget … pulled from all these locations."  "You would see actual material costs over budget by 100 percent someplace, but there was no way to trace it."  "What was going on?  We didn't know."  There was no way to know and executives of TERP did not care when informed of these problems.

89.     As to whether there was an attempt to apply Generally Accepted Accounting Principles ("GAAP") in assessing the financial performance of TERP's assets, the Director of Global Financial Planning & Analysis stated that the "system was a mess."  "When I got there in August 2014, it was the worst situation I had ever seen."  Not only was GAAP routinely ignored in the Company's reporting of financial results, TERP essentially had no internal controls over the non-GAAP-compliant numbers it was reporting quarter after quarter through the first half of 2015, and executives at all levels were fully aware of this.

90.     And worst of all, Chatila ordered employees to change numbers reported for revenue forecasts.  The Director of Global Financial Planning & Analysis was occasionally asked to join weekly conference calls conducted by Chatila with TERP and SunEdison officers.  Chatila, whom "everybody feared," led the calls and ordered all others, both TERP and SunEdison officials, to carry out his instructions.  "You would hear people say 'I'm not going to meet my [revenue] forecast; it's not possible.'"  In response, Chatila "would say 'I don't care what's possible, I'm telling you what will happen.  Just put down the numbers.'"

91.     The Director of Global Financial Planning & Analysis stated that TERP's reporting was all done in Excel.  Data reported in press releases and financial statements was pulled directly from Excel spreadsheets.  There were no access controls, so Ted, the junior accounting clerk, could just go in and misreport $1 million as $10 million.  As explained below, SunEdison had the same problem.

92.     The Director of Global Financial Planning & Analysis stated that Bill Hanson, the only person at TERP responsible for TERP's financial reporting for the first four quarters of the Director of Global Financial Planning & Analysis's tenure, would stay up for 36 hours straight to do his job.  Inevitably, the strain would cause Hanson to make mistakes and miss errors.  If Hanson missed errors, then the only line of defense was TERP's auditors.  The Director of Global Financial Planning & Analysis wondered – what if the next error we miss is material?

## SunEdison's Internal Control Over Financial Reporting During The Class Period

93.     SunEdison's internal control over financial reporting was completely inadequate. The Head of Global Field Operations for SunEdison from April 2015 to October 2015 stated that "everyone at the entire company knew it was the worst part of the business."  As a result, SunEdison was "the most dysfunctional company [he] ever worked for" with "unexplained bad" "systems in general on tracking and managing jobs and quarterly accounting for job costs and everything else," no security on data, no checks and balances on data access and data input, and, overall, an utter lack of internal controls in place.  "It was completely dysfunctional as to how everyone interacted with all these systems."  "It's hard to explain because it was so rampant.  It was just so wrong."  According to the complaint in *Horowitz, et al. v SunEdison, Inc., et al.*, 16-cv-07917-PKC, another class action in this MDL (the "*Horowitz* Complaint"), the Project Coordinator & A/P Analyst, who worked at SunEdison from May 2013 to May 2016, explained that while SunEdison purported to be "the biggest renewable energy company in the world," SunEdison, in part because of its ineffective system of internal controls over financial reporting, was in reality "the biggest joke in the world."

94.     SunEdison employees have stated that SunEdison's ineffective internal control over financial reporting stems from the fact that SunEdison, as a result of its business strategy of

acquiring renewable energy companies and then developing and managing the acquired companies' projects, never integrated the companies' various systems with its own and thus never created a single, effective and accurate reporting system, just as it failed to do for TERP.

95.    Rather than forming a coherent system of financial reporting in which SunEdison employees could input project costs and revenues into a unified system, SunEdison's piecemeal system of financial reporting made it impossible for anyone at SunEdison to ever know how much money it had and what was owed to creditors. SunEdison used several enterprise resource planning ("ERP") systems, and never successfully integrated any of these systems into a single accounting platform.

96.    Not only did SunEdison rely on numerous platforms to report revenue and costs, none of these systems worked together. For example, if a SunEdison employee adjusted a line item on a project, that same adjustment would have to be manually entered across every accounting system in order to accurately reflect the change. The Head of Global Field Operations stated that such manual inputting of data across platforms led to "bastardized" financial results so that there was "never a true version of the truth." Moreover, as SunEdison continued to acquire companies throughout the Class Period, many of which were dropped down into TERP, SunEdison continued to introduce more systems and processes and was so disorganized that SunEdison could not even accurately keep track of how many projects or employees it had – much less available cash and debts owed to creditors. As the Head of Global Field Operations explained the situation with SunEdison's many systems, "every division was off in their own world" and it was impossible to have accurate consolidation.

97.    The process for manually entering SunEdison's financial data was labyrinthine and prone to creating and perpetuating accounting errors. Throughout the Class Period, the

practice was to manually consolidate SunEdison's financial data into an Excel spreadsheet. According to the *Horowitz* Complaint, the Senior Auditor & Accountant who worked at SunEdison from September 2012 to September 2014 and who evaluated SunEdison's internal controls "every single day," stated that "it was a nightmare to consolidate." All of the entities using one system, for example, Timberline, had to input their financial data into the system, close out, and those entries would then be passed to SunEdison's Finance Department. Each SunEdison project or acquisition would then have to go through this process on its own. The controller for each group would go through the line items for each project. After this was done for each project in each accounting system, SunEdison's Finance Department would then consolidate each project from each accounting system into a massive Excel spreadsheet document, done manually.

98.     The consolidated Excel spreadsheet was so complicated and time-consuming that the Head of Global Field Operations explained that this process was "literally the most complicated spreadsheet" he had ever seen and was known internally as the "Brain Damage" spreadsheet. As a result, the Head of Global Field Operations recalled that SunEdison's internal controls were a "web of chaos and confusion" and "the biggest mess ever" and that SunEdison's system of recording project finance data was so "mind bogglingly" poor that the Head of Global Field Operations thought it had to have been "intentional" because it inevitably led to "massive underpayment" to SunEdison's creditors. SunEdison's internal control systems were so complicated that the Head of Global Operations, in his resignation email to his supervisor, Gokul Krishnan, dated October 5, 2015, took the time to express just how flawed SunEdison's internal controls were and were part of the reason he could not effectively do his job, thus forcing him to resign:

Complicated systems and process – this is probably the biggest weakness at SunEdison currently and there was never a true focus on getting them fixed. There were a lot of meetings and a lot of discussions on it but in the end not much would change and the hard part of this was me and my team ended up being the brunt of most of the gaps in the systems and having to explain these to partners or other internal teams ….

99.     Additionally, SunEdison's use of an Excel spreadsheet was a profoundly flawed method for accounting for SunEdison's complex financial transactions because Excel, particularly as SunEdison used it, is not a proper accounting platform. Unlike proper accounting software, which has built-in controls, Excel has no input controls to ensure that data is entered correctly by code and category. As such, line items that are incorrectly entered can go unnoticed and generate domino effects of miscalculations. This caused data to be misclassified and financial information misreported such that large amounts of money per project were often lost in the reconciliation process for any given project at any given time, resulting in, as explained by the Head of Global Field Operations, multi-million dollar mistakes on projects with respect to how much a vendor or creditor was owed. As he explained, hundreds of millions of dollars were impacted and the numbers were "insanely inaccurate." For example, in late 2015, SunEdison engaged the solar contracting company Bright Planet Solar, for which the Head of Global Field Operations worked after he left SunEdison and continues to work today. SunEdison claimed that it owed Bright Planet Solar only $800,000, but emails showed that SunEdison actually owed Bright Planet in excess of $2 million. The Head of Global Field Operations added that "there were always discrepancies." A company "thought or knew [it] was owed something, but [SunEdison's] system said something different and they were never reconciled. It was overwhelming. No numbers ever matched up across any system or company or platform." "It was so dysfunctional; it was just part of life there. It was accepted. Numbers never matched up anywhere."

100.     The Director of Corporate Development stated that "all of the ERPs fed into a single consolidated platform.  That platform was never finely tuned.  So, when numbers fed into it, it was like a puzzle."  It was not uncommon for numbers not to match.  That prompted a different procedure involving a basic Excel spreadsheet.  "They would set off on manual reconciliation.  Tons of Excel spreadsheets."  "[T]he company's inter-company balance was off by hundreds of millions of dollars."  "They had paid one of the consulting firms, Gen Pact, … tons of money to come in and try to unwind all the inter-company accounting because it was literally out of balance by hundreds of millions of dollars."  "I still don't know how anybody in good conscience could say our financials have to be right."  "We had multiple material weaknesses and multiple internal deficiencies."

101.     In violation of basic internal control principles, SunEdison, like TERP, lacked access controls to its Excel spreadsheets system.  Consequently, anyone with even minimal security clearance had access to, and could make changes to, SunEdison's central reporting system.  Access controls regulate and restrict users' ability to make certain data entries unless users provide the appropriate clearance.  The Head of Global Field Operations stated that SunEdison "gave authority to the lowest level employee, like call center people, who could go in and change the economics of any deal."  During the Class Period, SunEdison's access controls were so defective and had such "insanely bad data integrity" that the Head of Global Field Operations and others had access to SunEdison's financial data even after leaving the company.

102.     Although employees manually entered data by mistake, data was also entered incorrectly on purpose at SunEdison (and at TERP as explained above).  According to the Head of Global Field Operations, there was "massive pressure" from SunEdison executives to show progress on all projects and accounts.  As the Head of Global Field Operations reported, every

month, there would be a meeting to update the sales and operations executives on the state and finances of SunEdison's projects.  In preparation for these meetings, in order to show purported project progress, sales employees engaged in "massive cleanups" which included account managers improperly changing the numbers on projects to make a project look more favorable. The Head of Global Field Operations explained that "anyone with access could change the economics of a deal" and that prior to monthly meetings, there was a "mad dash" to get the numbers updated and show progress.

103.   The Director of Corporate Development stated that SunEdison's financial reporting team was provided specific goals as far as what the team needed to make the company's internal numbers reflect.  "There was a culture of '[h]ere is what the numbers have to be.  Find a way to make it work.'"  "You basically were given the goal and said, justify how this works, as opposed to rationally saying, these are the numbers."  Such expectations and demands to massage the financials toward a specific, pre-determined goal was occurring within SunEdison before February 2015.  SunEdison engaged in what he called accounting gymnastics which he described as "[e]ither the manipulation of the numbers, [or] the presentation of the numbers. 'Here is what the numbers are, let's go find the accounting guidance.'  It was not uncommon."  It typically occurred at the end of a quarter.  "They realized they needed – there were times at the end of quarters, we had to justify a cash position or justify revenue we said existed versus per regular accounting rules.  It was a standard practice for the company.  'This is the number that we need to get to.'"  The Director added that the accounting gymnastics definitely goes back as far as the 2014 10-K.  "It might even go back to the 2013 10-K."

104.   SunEdison's flawed internal control over financial reporting and its impact on TERP was widely known within SunEdison and TERP.  The Director of Corporate Development

stated that Chatila and Wuebbels had "110 percent" knowledge that SunEdison's woeful internal controls were negatively affecting TERP. "I can tell you that I sat outside Brian [Wuebbel's] office and [] raised it to him personally a few times." The issue of internal controls was discussed publicly in Town Hall meetings. "I can't say a specific time because it was mentioned so often." "It was widely known that our internal control structure was a disaster." "I know in [quarterly all-hands] meetings, it was clearly stated by Brian [Wuebbels] and Ahmad [Chatila] – our current process is not sustainable."

105.    With respect to problems associated with consolidating SunEdison's financial data into Excel, these problems existed for quite some time, were so obvious, and so detrimental that, according to the *Horowitz* Complaint, the Senior Auditor & Accountant stated that Defendants Chatila and Wuebbels were "of course" aware of the inconsistencies and incorrect data that was represented and that "everyone" within SunEdison knew about it because "it had been going on for years," that "it's hard to imagine [Wuebbel's] not knowing about it," and that he would "challenge anyone" who might claim that Wuebbels and Chatila did not know of these problems. Likewise, the Head of Global Field Operations explained that he reported these issues to his supervisors, Gokul Krishnan, the COO, Global Residential & Small Commercial Solar, who reported directly to Vikas Desai, the Senior Vice-President and Global General Manager for the Residential and Small Commercial Business. Desai reported directly to Defendant Chatila. The Head of Global Field Operations would report these issues in meetings three to four times a month with Krishnan, SunEdison's CFO of Residential Small Commercial, and was told that resolving SunEdison's internal control problems was "priority number 1" and the executive team, including Defendant Wuebbels, was in the process of dealing with it.

**DEFENDANTS KNEW, BUT FAILED TO DISCLOSE, THAT SUNEDISON,
ON WHICH TERP WAS ADMITTEDLY DEPENDENT ON FOR DROP
DOWN ACQUISITIONS, WAS MISREPRESENTING AND OMITTING
MATERIAL FACTS CONCERNING ITS DEBT AND LIQUIDITY WHICH
CAUSED SIGNIFICANT RISK TO TERP'S GROWTH STRATEGY AT THAT TIME**

106.    From the beginning of the Class Period through November 2015, SunEdison, Chatila and Wuebbels consistently reassured the market that they were "comfortable" with SunEdison's "solid" liquidity position.   In reality, SunEdison was experiencing liquidity problems from at least the beginning of the Class Period, and Defendants were very much aware of the situation.

107.    SunEdison, at the direction of Chatila and Wuebbels, routinely delayed or refused to pay key vendors even when those vendors threatened to cease all services.  This was done in order to maximize the publicly reported cash on its balance sheet and hide the fact that it was experiencing liquidity shortfalls.  In the summer and fall of 2014, SunEdison's cash position was so poor that it was commonplace to not pay essential vendors such as basic utilities, including telephone and electricity service providers, who threatened to shut down service.

108.    The former Vice President of SunEdison's Micro-Inverter division from August 2011 to December 2015 stated that SunEdison's inability to pay vendors in a timely fashion was a systemic issue that he became aware of as soon as he began working at SunEdison in 2011. "From the beginning, payments to vendors [were] a challenge, as I recall."  "At times it would be a little better, but most of the time, it was very poor."  During the summer of 2015, he would get weekly calls from Intertek Testing Services, an "absolutely critical" vendor which provided compliance safety testing for SunEdison, during which Intertek requested payment of overdue invoices and threatened to stop performing services for SunEdison.  Notwithstanding that he pled with SunEdison's accounts payable department to pay Intertek, most of the time the invoices

were not paid on anything close to a timely basis.  "It was troubling to me that a company the size of SunEdison couldn't be a better payer of critical vendors."

109.    According to the *Horowitz* Complaint, this practice was confirmed by the Project Coordinator & A/P Analyst who, as previously stated, worked at SunEdison from May 2013 to May 2016 and reported directly to Justin Tomljanovic, the CFO of SunEdison North America, who in turn reported to Defendant Wuebbels.  The Project Coordinator & A/P Analyst, who had access to SunEdison's financial records and was directly involved in paying vendors and other invoices on projects, explained that SunEdison "never had cash," and that its liquidity problem was so obvious that "even the janitor" knew of the problem.  She explained that SunEdison's practice was to pay vendors in the priority of which vendor was refusing to work and would cause the greatest harm to the company's ability to generate revenue or effectively shut down projects.  When it came to paying vendors, she "had to beg" and fight with Zach Groves, SunEdison's Director of Finance, for funds.

110.    Similarly, the Director of Global Financial Planning & Analysis, who, as previously stated, was employed from August 2014 through May 2015, explained that SunEdison's liquidity problems existed from the beginning of his employment and that SunEdison "owed everyone tons of money."

111.    The former Executive Assistant to Defendant Hernandez from February 2015 to August 2015 explained that there were consistent problems paying vendors.  Even the temp agency which initially got her the job at TERP reached out to her personally to advise her that its fee had not been paid by SunEdison and that it was unable to obtain the money SunEdison owed it.  She added that almost every bill to vendors was overdue, some by as much as 180 days.  A Senior Settlement Accountant for SunEdison from May 2014 to July 2015 also stated, "They

were not paying – I know for a fact – any of the companies, such as employment agencies, they were using for contract workers.  None of them were getting paid."  "A lot of their staff was contracted employees.  The employees were getting paid by their agencies . . . , but they [SunEdison] weren't paying the agencies.  At one point, the agencies threatened to pull them out."  "I got phone calls [about SunEdison's failure to pay for such services] as early as March [2015]."

112.     The Senior Settlement Accountant stated that in some cases, project managers working at various SunEdison facilities who knew that the company was failing to pay its bills on time would use personal credit cards to cover critical costs.  The Director of Global Financial Planning & Analysis, who notably left by May 2015, confirmed that at times project managers paid SunEdison's expenses with their personal credit cards hoping to be reimbursed.

113.     The Senior Settlement Accountant stated:  "There was stuff – project managers I worked with, I know some of the managers were having to pay some of the smaller bills out of their own pockets and then get reimbursed."  These were employees who were "running some of the power plants, when there was stuff needing to be fixed and contractors had to come out and do it."  "It got to the point where they (repair technicians, etc.) weren't getting paid [so] they had to be paid first before they came out.  Some managers would pay with their own credit cards and get reimbursed."  "Then after a while, [project managers] stopped doing that because they weren't getting paid."

114.     The Senior Settlement Accountant stated that she saw first-hand how SunEdison was failing to pay its bills on both corporate spreadsheets and through SunEdison's internal computer network.  The SunEdison executives "just weren't approving the invoices or paying them."  The Senior Settlement Accountant said that during her time with SunEdison, the issue of

bill payment came up frequently and Defendant Chatila would simply dismiss it.  She recalls the issue being raised in quarterly all-hands meetings held by Chatila.  "The issue wasn't a secret at the company."  Ahmed "knew there was a problem, but to me, he kind of ignored it."  "People asked him point blank" and he gave "vague answers about what was going to happen with the bills."

115.    As alleged in the *Horowitz* Complaint, the Senior Auditor & Accountant stated that "Wuebbels wanted to know about everything" and payments to vendors were discussed during weekly meetings and monthly finance meetings, both of which Wuebbels either personally attended or the results of which were brought to his attention by Marie Washburn, SunEdison Controller; Jenny Cooper, SunEdison's CFO of Global Operations; or SunEdison's Director of Accounting.  During these weekly "cash calls," the CFOs of each region and their teams would take turns discussing the status of projects and cash needs in order to persuade the Finance Department to issue the funds necessary to pay vendors.  The Project Coordinator & A/P Analyst, who participated in these calls from 2014 to 2016, explained that Zach Groves, SunEdison's Director of Finance, would lead the calls and distribute the cash, but it was Wuebbels who had to approve or "sign off" on the decisions.

116.    Throughout the Class Period, Defendant Chatila directly addressed delayed payments to vendors during quarterly all hands live-casts to SunEdison and TERP personnel during which Chatila acknowledged that SunEdison's problems paying its vendors was a "broken system" which he promised to fix.  The Vice President of Micro-Inverters stated: "I do remember those events in terms of the live-casts and Ahmad [Chatila's] promises to fix the broken system" and that during a 1Q 2015 live-cast, Chatila stated that "he and the executives were not going to get their bonus payments until the issues were resolved."  The quarterly live-

casts were typically held at the same time the company announced its earnings.  According to the *Horowitz* Complaint, SunEdison's former Director of Asset Management and Operations from December 2014 to December 2015 recalled a January 2015 "all hands" conference call led by Defendant Chatila in which a SunEdison employee raised that the company had been warned three times by a utility provider that it would turn off phone service because SunEdison had not paid its bills, and that suppliers were "breathing down their necks" and wanted escrow for lines of credit with SunEdison.  In response, Defendant Chatila went on a rant and stated that employees could work for a company that grew slowly (and thus had the cash to timely pay its vendors) or could work for SunEdison, which was a big, fast growth company.  Chatila added that these were the sacrifices that SunEdison would make for growth.

117.    The Director of Corporate Development stated that the situation was so bad that even the independent auditors threw up their hands because SunEdison was unable to pay for an audit.

118.    By the first quarter of 2015, SunEdison lacked the cash to sustain its acquisition-driven, yieldco-dependent business model.  In January 2015, SunEdison took on massive debt through the sale of $337 million in 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes") and a $410 million two-year loan (the "Margin Loan") in order to fund a new large acquisition.  In presentations and SEC filings, SunEdison, Chatila and Wuebbels falsely classified the Exchangeable Notes and the Margin Loan as non-recourse debt, but in reality, it was disclosed months later in mid-November 2015 in its public filing that this debt was actually recourse debt.  This caused highly significant repercussions for TERP's stock as TERP repeatedly told the market that the Company's growth strategy at that time was to acquire additional drop downs projects from SunEdison.

119.    Defendants Chatila and Wuebbels also falsely reassured the market on August 6, 2015 during a joint SunEdison/TERP Q2 2015 Earnings Conference Call that SunEdison had "greater than $1 billion" available, and Defendant Hernandez, during that same call, stated:  "In addition to our balance sheet liquidity we also benefit from incremental liquidity provided by the warehouse facilities we have placed in order with our sponsor SunEdison and our infrastructure partners."  "In addition to maintaining significant balance sheet liquidity, the warehouses [credit facility] we have developed with SunEdison and our infrastructure partners provide another important tool to fund [TERP's] growth with significant financial flexibility."  This led analysts to comment positively that any liquidity concerns regarding SunEdison "appear [] more of a perception than a reality."  However, after the end of the Class Period, the market learned in a March 28, 2016 *Wall Street Journal* article entitled "SEC Investigating SunEdison's Disclosures to Investors About Its Liquidity" that the $1 billion included a $500 million warehouse credit facility "that SunEdison couldn't access" and should never have been included in SunEdison's liquidity calculations.

**DEFENDANTS FAILED TO DISCLOSE THAT SUNEDISON FORCED TERP TO PAY FOR EXPENSES AND PREPAYMENTS THAT TERP WAS NOT OBLIGATED TO PAY WHICH FURTHER MASKED SUNEDISON'S LIQUIDITY CRISIS AND CAUSED SIGNIFICANT RISK TO TERP'S GROWTH STRATEGY AT THAT TIME**

120.    Because SunEdison was running out of funds and scrambling for ways to raise cash, Defendant Chatila put pressure on TERP to pay for various expenses that SunEdison was obligated to pay.  Domenech's top Executive Administrative Assistant stated that "[TERP's] numbers were better than SunEdison's," and SunEdison used TERP to pay the costs of administering and operating a worldwide effort to expand renewable energy generation through the Management Services Agreement.  TERP would acquire SunEdison projects as drop down acquisitions and then pay SunEdison to manage those projects that TERP acquired.  But

SunEdison was also using TERP as its piggy bank to pay for costs that SunEdison was required to pay.  TERP "was paying for everything, everything," and Defendants Domenech and Hernandez were concerned about excessive "chargebacks."

121.    The Director of Global Financial Planning & Analysis further explained the meaning of chargebacks.  A chargeback was any cost incurred and paid for by TERP that SunEdison was obligated to pay.  There would be "a settling up period" at the end of a month or quarter and "TERP would charge it back to SunEdison."  For example, Defendant Hernandez was due a bonus amounting to more than $1 million in March 2015 which SunEdison was required to pay.  Because SunEdison did not have the cash, TERP paid it as a wire transfer from its bank account.  These payments by TERP further masked SunEdison's liquidity crisis which posed a significant risk to TERP's growth strategy at that time.

122.    SunEdison's Director of Corporate Development stated that "SunEdison was using money that should have gone to service [TERP] projects . . . ."  SunEdison was using the "money that was earmarked for service and tax on [TERP] projects.  That was a very common practice."  The Director of Corporate Development routinely would be contacted by members of SunEdison's global asset accounting team and/or global services team about this issue.  They would say "'[w]e have a responsibility to pay the [TERP] project [but] the cash is no longer there."  "They would come to find out that cash was used to fund a non-[TERP] expense."  "[It] created default issues on some of the projects that SunEdison was selling to [TERP]."

123.    Domenech's top Executive Administrative Assistant stated that Defendants Domenech and Hernandez and all other TERP executives were well aware of the chargeback issue, but deferred to anything Chatila wanted them to do.  TERP executives were concerned about whether SunEdison would succeed financially and knew that TERP was spending

significant cash to prop up SunEdison and Chatila.  Domenech's top Executive Administrative Assistant also believed that "they were playing games with the numbers."

124.    SunEdison was so desperate for cash that, at SunEdison's request, TERP would also regularly prepay SunEdison on dropdown projects – "$1 million, $5 million, $10 million" according to the Director of Global Financial Planning & Analysis.  SunEdison was not contractually entitled to the prepayments, and TERP did not receive discounts or any form of consideration for making the prepayments.  The prepayments would eventually be taken out of the final price for the acquisition.  According to the Director of Global Financial Planning & Analysis, "SunEdison was constantly in this cash crunch" and the prepayments were especially prevalent near the end of the quarter, when they would be used to burnish SunEdison's cash position.  The Director of Global Financial Planning & Analysis estimates that TERP would make between $25-50 million in prepayments every quarter.  The prepayments were also confirmed by TERP's Vice President of Operations and Finance from September 2014 to January 2016.  He also stated that "[e]ven though a project wasn't quite ready, [TERP] would fund SunEdison because they needed the money to wrap up the project."  TERP's prepayments further masked SunEdison's liquidity crisis which caused significant risk to TERP's growth strategy at that time.

## THE RELATIONSHIP BETWEEN SUNEDISON AND ITS YIELDCOS FOREVER CHANGED MID-YEAR 2015

### SunEdison's Liquidity Crisis Spirals Out Of Control And The Yieldcos Grow Tired Of Coming To The Rescue

125.    The relationship between SunEdison, TERP, and Global forever changed in the second half of 2015.  As further explained below, and as stated by TERP's Vice President of Operations, "[t]hings got discombobulated when Carlos [Domenech] and other Board members

refused to transfer more money to SunEdison knowing it wasn't going to come back." "I think we all knew SunEdison was a big risk, and SunEdison's ability to execute would impact [TERP]." "I think Carlos [Domenech] and Francisco [Perez] and other people who sat on the [TERP] Board put their foot down and said we can't continue to transfer the cash." "They knew the risks. This was built up over quite some time."

126.    On September 2, 2015, Chatila made a public statement during a *Bloomberg* interview that SunEdison would generate positive cash flow in late 2015 or early 2016. Chatila stated: "The most important question for investors is when do we start generating cash for a living?" "I have said it's at the end of 2016 or early 2017. But we've been signaling it's going to be a lot sooner than that, probably early 2016 or late 2015." Chatila's statement was false. The *Wall Street Journal* reported on April 14, 2016 that "[d]ays earlier, an internal presentation to SunEdison's board showed the company wouldn't have positive cash flow until at least the second quarter of 2016. Senior executives read the Bloomberg story agape." These facts were corroborated by two complaints filed by Domenech (*Carlos Domenech Zornoza v. TerraForm Global, Inc*., *et al.*, No, 17-cv-00515-GJH (D. Md.) (the "*Domenech* Complaint")) and Perez (*Francisco J. Perez Gundin v. TerraForm Global*, *Inc.*, *et al*., No. 17-cv-00516-GJH (D. Md.) (the "*Perez* Complaint") (collectively, the "*Domenech* and *Perez* Complaints"), both of whom have first-hand knowledge that, six days earlier, at SunEdison's August 27, 2015 Board meeting led by Defendants Chatila and Wuebbels, it was reported that SunEdison would have a net reduction in cash on hand, or cash-burn rate, of $425 million in Q4 of 2015 and a further net cash reduction of $32 million in Q1 of 2016.

127.    Apparently fed up with SunEdison's lies to the public, Defendant Domenech and Perez admit in their complaints that no later than mid-September 2015, they raised concerns to

Defendant Chatila about the coherence and transparency of presentations that had been recently made by Chatila and Wuebbels about SunEdison's actual and prospective cash holdings and liquidity.  With full knowledge that SunEdison's liquidity would affect TERP's growth strategy at the time, Domenech offered his help to review SunEdison's cash position, and Chatila agreed to the formation of a working group led by Defendants Domenech and Wuebbels to assess SunEdison's cash position in terms of cash that was restricted or unavailable for use and unrestricted cash that could be immediately used for any business need.

128.    According to his complaint, on October 5, 2015, Defendant Domenech told Defendant Chatila that SunEdison's current unrestricted cash amounted to $342 million.  But only two days later, on October 7, 2015, during a live public webcast investor presentation, Chatila stated that SunEdison "remains well capitalized with adequate liquidity" and Defendant Wuebbels stated that excluding the cash from TERP and Global, "the cash available at the standalone devco [SunEdison] was standing at approximately $1.4 billion at the end of the [third] quarter [September 30, 2016], up from $900 million at the end of the second quarter."  There was no mention of the amount of unrestricted cash.  Additionally, in a PowerPoint presentation during the webcast investor presentation, Chatila described SunEdison's liquidity position as "robust" and Wuebbels described SunEdison's liquidity as "strong."  However, as discussed above, the market later learned in a March 28, 2016 *Wall Street Journal* article entitled "SEC Investigating SunEdison's Disclosures to Investors About Its Liquidity" that the $1 billion figure included a $500 million warehouse credit facility "that SunEdison couldn't access" and should never have been included in SunEdison's liquidity calculations.  The *Domenech* and *Perez* Complaints corroborate what was reported in the *Wall Street Journal*.

129.    In or about October, 2015, SunEdison also told Defendant Hernandez that SunEdison had a short-term need for additional cash and made a demand for funds from the yieldcos, according to the verified complaint in *TerraForm Global v. SunEdison, Inc.*, *et al.*, No. 12159-VCL (Del. Ch. Ct. 2016) (the "*Global* Verified Complaint").

130.    Also in October 2015, the entire Margin Loan, $439 million, became mandatorily prepayable.    SunEdison, however, did not have enough cash to make this payment so SunEdison's only hope was to seek more money from TERP and Global.    Later, SunEdison would admit in an April 21, 2016 Bankruptcy Court filing that the Margin Loan was "integral to SunEdison's liquidity position" and that "in October 2015 the entire Margin Loan became mandatorily prepayable.    This Prepayment, which amounted to $439 million, ***drained SunEdison's cash reserves and fundamentally changed its and [TERP and Global's] financial outlook.*"    Emphasis added.    In other words, SunEdison's liquidity, or lack thereof, affected TERP's financial outlook.    As discussed below, SunEdison managed to delay the prepayment until November 20.

131.    Defendants Chatila and Wuebbels proposed a transaction in mid-October between SunEdison and Global that would have provided SunEdison with increased liquidity through prepayments by Global.    Chatila and Wuebbels proposed that a subsidiary of Global purchase from another subsidiary of SunEdison certain solar projects that were in their early stages of development in India (the "India Transaction").    This was confirmed by the *Domenech* and *Perez* Complaints.    The *Global* Verified Complaint confirms that both Domenech and Perez evaluated the transaction but concluded by the end of October that they were not ready to be dropped down to Global.    The *Domenech* and *Perez* Complaints allege that Perez advised Domenech, his direct supervisor at Global, that he did not think that the India Transaction was in Global's best

interests in light of SunEdison's liquidity position and its apparent inability to provide collateral or other security for prepayments by Global, and that Global should not prepay SunEdison for projects that were only in the early stages of development.  Defendant Domenech advised Global's Board and Corporate Governance and Conflicts Committee that he opposed the India Transaction because the projects included in the transaction had been previously considered and rejected by Global less than three months earlier at the time of Global's IPO, and the concerns about SunEdison's liquidity position and its apparent inability to provide collateral or other security for Global's prepayments.

132.    Defendants Chatila and Wuebbels, as confirmed by the *Domenech* and *Perez* Complaints, presented certain preliminary financial results and forecasts to senior management of SunEdison, TERP and Global on October 19, 2015 at the Quarterly Business Review. Defendant Domenech attended the meeting, during which Chatila and Wuebbels projected that SunEdison would have a cash-burn rate of $801 million in Q4 2015 and $521 million in Q1 2016, and a six-quarter forecast showing a cumulative cash-burn rate of $1.075 billion.

133.    Defendant Chatila met individually with senior executives and managers in charge of SunEdison, TERP, and Global's operating units shortly before and immediately following the Quarterly Business Review on October 19, 2015 to coerce them to change revenue and expense forecasts for the business units so that he could reduce SunEdison's projected cash-burn rate.  Defendant Chatila conducted one such meeting with Perez, who as previously mentioned, was the COO of TERP, Global and SunEdison.  Perez, however, refused and told Chatila that he had no factual basis for lowering the projected cash-burn rate of any business unit, and that Chatila and SunEdison should instead take meaningful actions to address

SunEdison's liquidity crisis.  In response, Defendant Chatila became very agitated and berated Perez in a profanity-laced tirade.  This is confirmed by the *Domenech* and *Perez* Complaints,

134.    On October 26, 2015, SunEdison held a Board meeting in SunEdison's offices in California.  The *Domenech* and *Perez* Complaints both state that Domenech and three other senior executives of SunEdison, TERP and Global who were extremely concerned about SunEdison's liquidity and the reliability of its cash forecasts, flew to California to be available in person to speak to SunEdison's Board during or after the meeting.  Defendant Domenech was joined by Defendants Hernandez and Perez, and Paul Gaynor ("Gaynor"), an Executive Vice President of SunEdison in charge of its utility operations.  Although they had been initially invited to join the meeting in person, they were only permitted to participate by telephone, despite being in a hotel room next to SunEdison's office.

135.    During the meeting, Defendants Chatila and Wuebbels presented a cash forecast that was very different than the forecast just a weak earlier at the Quarterly Business Review meeting.  Chatila and Wuebbels told the SunEdison Board that they projected that SunEdison would burn $256 million in Q4 2015, $394 million in Q1 2016, and a cumulative net total of $643 million over the next six quarters.

136.    After their presentation, Domenech, Hernandez, Perez and Gaynor raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition.  This is confirmed by the *Domenech* Complaint, the *Perez* Complaint and the *Global* Verified Complaint.

137.    Perez spoke first and advised the SunEdison Board that he "completely disagreed" with the financial forecast presented by Chatila and Wuebbels which presented a far more positive outlook than their presentation just a week earlier at the Quarterly Business

Review meeting; that the presentation was based on a variety of unrealistic and problematic assumptions; that SunEdison appeared to have less than $90 million of unrestricted cash, close to $3 billion in projects under construction, and over $2,700 employees on payroll (which included all TERP personnel); that he was alarmed by SunEdison's failure to investigate these financial losses and the apparent lack of reliability of SunEdison's internal and external cash reporting and forecasting; that SunEdison appeared to need a significant cash infusion to address its liquidity crisis, and expressed concern, more generally, about SunEdison's complete lack of transparency regarding its financial information.  This is confirmed by the *Domenech* and *Perez* Complaints.

138.    Defendant Domenech told the SunEdison Board that he agreed with Perez's statements; that the assumptions in the Chatila and Wuebbels forecast appeared to be unreliable and unduly optimistic; and improperly included $49 million in Q4 2015 from the India Transaction that had not received approval from Global's Corporate Governance and Conflicts Committee.  This is confirmed by the *Domenech* and *Perez* Complaints.

139.    Defendant Hernandez also expressed concern over the reliability of SunEdison's liquidity reporting and projections.  This is confirmed by the *Domenech* and *Perez* Complaints.

140.    Gaynor stated that the cash position statements and projections Defendants Chatila and Wuebbels had made regarding SunEdison divisions under his direct control did not appear to be reliable.  This is confirmed by the *Domenech* and *Perez* Complaints.

141.    TERP investors were left in the dark.  Chatila and Wuebbels were making public statements that SunEdison's liquidity was robust and strong, but were not told that TERP's directors and officers knew that TERP's growth strategy at the time – to acquire projects from SunEdison – was significantly at risk due to SunEdison's liquidity crisis.

142.     On November 9, 2015, SunEdison filed its quarterly report on Form 10-Q with the SEC announcing its financial and operating results for the third quarter ended September 30, 2015 which revealed devastating facts about its debt and liquidity.  SunEdison disclosed that: (i) in July 2015, it had taken out a $169 million one-year loan at an effective rate of interest of 15% – contradicting its August 6, 2015 representations that it had enough cash to fund its operations for 12 months; (ii) it had to deposit an additional $91 million in cash on the Margin Loan; and (iii) it had reclassified the $740 million in debt under the Margin Loan and Exchangeable Notes from non-recourse to recourse debt.

143.     Throughout November 2015, SunEdison attempted to force transactions upon TERP and Global in an effort to increase its liquidity.  According to the Director of Corporate Development, "[t]hey kind of did an 11th hour, behind closed doors, . . . 'you have to pay us this upfront.'"  Chatila told Perez "find a way" for TERP or Global to lend cash to SunEdison.  On November 18, 2015, the TERP and Global Corporate Governance and Conflicts Committees, along with their legal and financial advisors, and Defendants Domenech and Perez, reviewed a variety of potential alternatives for making $100 million available to SunEdison, but ultimately concluded that they could not execute any of the transactions in the time period requested by SunEdison, including because SunEdison would not agree to governance changes as part of any deal.  This is corroborated by the *Domenech* Complaint, the *Perez* Complaint, and the *Global* Verified Complaint.

144.     Given the severity of SunEdison's liquidity crisis, on November 18, 2015, Perez recommended to Chatila that SunEdison consider filing for bankruptcy protection.  Chatila responded that he was giving serious consideration to this option.  This is confirmed by the *Domenech* and *Perez* Complaints.

145.    In retaliation for not making $100 million available to SunEdison, and in order to obtain much needed cash, on November 19, 2015, SunEdison's Board called meetings of TERP's and Global's Boards for November 20 to replace the senior management and the members of the Corporate Governance and Conflicts Committees of both TERP and Global.

### The Friday Night Massacre

146.    In what was later termed the "Friday Night Massacre," on November 20, 2015, SunEdison reconstituted TERP and Global's Boards and dispensed with their management. SunEdison used its legal and contractual authority to:  (i) appoint Blackmore and Jenkins-Stark as directors of TERP, whereupon the Board voted to expand itself and elect Compton as a director of TERP; (ii) appoint Blackmore as Chairman of the Board after Chatila's resignation as Chairman of the Board; (iii) replace the existing Corporate Governance and Conflicts Committees of TERP (and Global) with Blackmore, Jenkins-Stark and Compton; (iv) terminate Defendant Domenech as TERP's (and Global's) President and CEO, and terminate his employment with SunEdison (thus removing him from the Boards of those companies); (v) terminate Defendant Hernandez as TERP's (and Global's) CFO, and terminate his employment with SunEdison; and (vi) appoint Wuebbels as TERP's (and Global's) President and CEO, and another SunEdison executive as TERP's (and Global's) interim CFO.

147.    As a result of their disagreement with these actions, Perez, Florian, and Lerdal resigned from the TERP Board on November 20, 2015 after these actions were taken.  Prior to the meeting, Lerdal was the chairperson of the TERP and Global Corporate Governance and Conflicts Committees and a member of the Audit Committee of TERP's Board.

148.    In the afternoon of November 20, 2015, the newly reconstituted TERP and Global Boards and Corporate Governance and Conflicts Committees approved the terminations of

Defendants Domenech and Hernandez and the appointments of Blackmore, Jenkins-Stark and Compton to the Corporate Governance and Conflicts Committees.

149.    According to the *Global* Verified Complaint, that same day, the newly appointed Corporate Governance and Conflicts Committee of Global met telephonically and agreed to advance $231 million to SunEdison (to be paid in two installments – a first installment of $150 million, and a second of $81 million to be paid within three business days) in order to facilitate SunEdison's completion of the India Transaction and to secure a transfer of SunEdison's equity interests in these projects to Global in the near term.

150.    Within minutes of Global's Corporate Governance and Conflicts Committee's approval of the transaction, Wuebbels caused $150 million to be wired from Global's bank account to SunEdison.  Instead of using the $150 million for purposes of the India Transaction, SunEdison used in excess of $90 million of the funds extracted from Global to pay off its Margin Loan mere minutes before a payment deadline that same day.

151.    On November 22, 2015, Cranna was appointed Executive Vice President and CFO of TERP (and Global).

**MATERIALLY FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

152.    The Class Period begins on July 18, 2014 when TERP's stock began trading in connection with its IPO.  The July 17, 2014 Prospectus stated in part:

We intend to create value for the holders of our Class A common stock by…

• growing our business by acquiring contracted clean power generation assets from our Sponsor [SunEdison] and third parties….

***

Our growth strategy is dependent to a significant degree on acquiring new solar energy projects from our Sponsor and third parties.  Our Sponsor's . . . failure to complete such

48

projects in a timely manner, or at all, could have a material adverse effect on our growth strategy.

***

Our Sponsor will be our controlling stockholder and will exercise substantial influence over TerraForm Power, and we are highly dependent on our Sponsor.

***

Our ability to execute our growth strategy is dependent on our ability to acquire additional clean power generation assets from our Sponsor and unaffiliated third parties.

153.    The statements made by Defendants in ¶ 152 were false and/or misleading statements and/or failed to disclose that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its liquidity which caused significant risk to TERP's growth strategy at that time.

**Second Quarter of 2014**

154.    On September 2, 2014, TERP issued a press release and filed a Current Report on Form 8-K with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 8-K").  For the quarter, TERP reported a net loss of $12.44 million.  In the press release, Domenech stated:  "Following our successful IPO in July, [TERP] is well-positioned for growth due to accelerating drop downs from SunEdison and its liquidity position."  "SunEdison's pipeline and backlog increased . . . as of June 30, 2014, and we continue to see synergies in the SunEdison/[TERP] platform."

155.    On September 2, 2014, TERP also filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2014 8-K and reporting in full its financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  The Q2 2014 10-Q was signed by Sanjeev Kumar, Senior Vice President and

49

CFO at the time.  In addition to the information described in its Q2 2014 8-K, TERP compared the Company's net loss of $12.44 million to a net profit of $341,000 for the same period in the prior year, and reported revenue of $21.97 million, compared to revenue of $4.66 million for the same period in the prior year.

156.    In the Q2 2014 10-Q, TERP stated, in part:

*Management Services Agreement*

Immediately prior to the completion of the IPO on July 23, 2014, [TERP] … entered into a management services agreement (the "Management Services Agreement" or "MSA") with SunEdison.  Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services to [TERP] and its subsidiaries.

\*\*\*

Our growth strategy is dependent on our ability to acquire additional clean power generation assets from SunEdison and unaffiliated third parties.

\*\*\*

*Changes in Internal Control Over Financial Reporting*

There have been no changes in [TERP's] internal control over financial reporting during the quarter ended June 30, 2014 that have materially affected, or are reasonably likely to materially affect, [TERP's] internal control over financial reporting.

157.    The Q2 2014 10-Q contained signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Domenech and Sanjeev Kumar stating that the Q2 2014 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their

supervision; and disclosed any material changes to the Company's internal control over financial reporting.

158.    The statements made by Defendants in ¶¶ 154-157 were false and/or misleading statements and/or failed to disclose: (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

**Third Quarter of 2014**

159.    On November 6, 2014, TERP issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 8-K").  For the quarter, TERP reported a net loss of $4.01 million, or $0.15 per diluted share, on revenue of $53.22 million, compared to revenue of $5.40 million for the same period in the prior year.  Defendant Domenech stated that TERP "continues to build on the two pillars of our growth strategy: organic drop downs from our sponsor [SunEdison], and acquisitions from third parties."  "During our third quarter, we . . . announced accelerated drop downs from SunEdison."

160.    On November 6, 2014, TERP also filed a quarterly report on Form 10-Q with the SEC signed by the Defendant Hernandez reiterating the financial and operating results previously announced in the Q3 2014 8-K and reporting in full its financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

161.    In the Q3 2014 10-Q, TERP stated, in part:

*Management Services Agreement*

Immediately prior to the completion of the IPO on July 23, 2014, [TERP] … entered into the MSA with SunEdison.  Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

***

*Changes in Internal Control Over Financial Reporting*

There have been no changes in the Company's internal control over financial reporting … during the quarter ended September 30, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

162.    The Q3 2014 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the Q3 2014 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

163.   On January 9, 2015, the Company filed a Prospectus with the SEC (Registration

No. 333-200829) relating to the resale of Class A common stock.   The January 9, 2015

Prospectus stated, in part:

> Our growth strategy is dependent to a significant degree on acquiring new solar energy
> projects from our Sponsor and third parties.   Our Sponsor's or such third parties' failure
> to complete such projects in a timely manner, or at all, could have a material adverse
> effect on our growth strategy.

164.   The January 9, 2015 Prospectus also stated, in part:

*Management Services Agreement*

> Immediately prior to the completion of the IPO on July 23, 2014, [TERP] entered into the
> MSA with SunEdison.   Pursuant to the MSA, SunEdison agreed to provide or arrange for
> other service providers to provide management and administrative services including
> legal, accounting, tax, treasury, information technology, insurance, employee benefit
> costs, communications, human resources, and procurement to   the   Company   and   its
> subsidiaries.

165.   On January 20, 2015, the Company filed a Prospectus with the SEC (Registration

No. 333-200830) relating to the resale of Class A common stock.   The January 20, 2015

Prospectus stated, in part:

> Our growth strategy is dependent to a significant degree on acquiring new solar energy
> projects from our Sponsor and third parties.   Our Sponsor's or such third parties' failure
> to complete such projects in a timely manner, or at all, could have a material adverse
> effect on our growth strategy.

166.   The January 20, 2015 Prospectus also stated, in part:

*Management Services Agreement*

> Immediately prior to the completion of the IPO on July 23, 2014, [TERP] entered into the
> MSA with SunEdison.   Pursuant to the MSA, SunEdison agreed to provide or arrange for
> other service providers to provide management and administrative services including
> legal, accounting, tax, treasury, information technology, insurance, employee benefit
> costs, communications, human resources, and procurement to   the   Company   and   its
> subsidiaries.

167.    The statements made by Defendants in ¶¶ 159-166 were false and/or misleading statements and/or failed to disclose: (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

**Fourth Quarter and Full Year 2014**

168.    On February 18, 2015, the Company issued a press release and filed a Current Report on Form 8-K reporting certain of its financial and operating results for the fourth quarter and year ended December 31, 2014 (the "2014 8-K").  For the quarter, TERP reported revenue of $43 million, "reflecting the positive impact of acquisitions and drop downs during the quarter." For 2014, TERP reported a net loss of $75.75 million on revenue of $125.86 million, compared to a net loss of $280,000 on revenue of $17.47 million for the same period in the prior year. Defendant Domenech stated:  "During the quarter, we delivered on our growth strategy by . . . accelerating drop downs [from SunEdison], and doubling our drop down inventory [from SunEdison]. . . ."

169.    On March 13, 2015, the Company filed an Annual Report on Form 10-K with the SEC, reiterating certain financial and operating results previously announced in the 2014 8-K

54

and reporting in full its financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  The 2014 10-K was signed by Defendant Domenech, Hernandez, Chatila, Wuebbels, and Perez.  In addition to the information described in its 2014 8-K, TERP reported a net loss of $125.86 million, or $0.87 per diluted share.

170.    In the 2014 10-K, TERP stated, in part:

*Changes in Internal Control Over Financial Reporting*

There have been no changes in the Company's internal control over financial reporting … during the year ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

\*\*\*

*Management Services Agreement*

Immediately prior to the completion of the IPO on July 23, 2014, [TERP] entered into the Management Services Agreement with SunEdison.   Pursuant to the Management Services Agreement, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

171.    In the 2014 10-K, TERP also stated (emphasis in original):

***The growth of our business depends on locating and acquiring interests in additional, attractive clean energy power generation facilities from SunEdison and unaffiliated third parties at favorable prices.*** Our primary business strategy is to acquire clean energy power generation facilities that are operational from both SunEdison and third parties.

\*\*\*

***SunEdison is our controlling stockholder and exercises substantial influence over TerraForm Power, and we are highly dependent on SunEdison.***

172.    The 2014 10-K contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the 2014 10-K did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are

responsible for establishing and maintaining internal control over financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

173. On April 9, 2015, the Company filed a Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock. The April 9, 2015 Prospectus stated, in part:

*Management Services Agreement*

Immediately prior to the completion of our IPO, [TERP] and SunEdison entered into the Management Services Agreement pursuant to which SunEdison agreed to provide or arrange for other service providers to provide management and administrative services to us and our subsidiaries.

*Services Rendered*

Under the Management Services Agreement, SunEdison or certain of its affiliates provides or arranges for the provision by an appropriate service provider of the following services:

- causing or supervising the carrying out of all day-to-day management, secretarial, accounting, banking, treasury, administrative, liaison, representative, regulatory and reporting functions and obligations.

***

- recommending and implementing our business strategy, including potential new markets to enter;

***

- causing our annual consolidated financial statements and quarterly interim financial statements and, as applicable, local statutory accounts to be: (i) prepared in accordance with generally accepted accounting principles or other applicable accounting principles for review and audit at least to such extent and with such frequency as may be required by law or regulation; and (ii) submitted to the relevant board of directors or its equivalent for its prior approval;

***

56

- arranging for individuals to carry out the functions of principal executive, accounting and financial officers for purposes of applicable securities laws;
- providing individuals to act as senior officers as agreed from time-to-time, subject to the approval of the relevant board of directors or its equivalent;

174. The statements made by Defendants in ¶¶ 168-173 were false and/or misleading statements and/or failed to disclose: (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

**First Quarter of 2015**

175. On May 7, 2015, TERP issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 8-K"). For the quarter, TERP reported a net loss of $28.12 million, or $0.57 per diluted share, on revenue of $70.52 million, compared to revenue of $11.88 million for the same period in the prior year. In the press release, Defendant Hernandez stated: "We continue to execute on our growth strategy while adhering to our conservative financial policy."

176. On May 7, 2015, TERP also filed a quarterly report on Form 10-Q with the SEC signed by Defendant Hernandez, reiterating the financial and operating results announced in the

Q1 2015 8-K and reporting in full its financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").

177.    In the Q1 2015 10-Q, TERP stated, in part:

*Management Services Agreement*

General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the Management Services Agreement. Pursuant to the Management Services Agreement, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

* * *

We believe we are well-positioned for substantial growth due to. . . SunEdison's project origination and asset management capabilities.

* * *

Growth in our portfolio will be driven by our relationship with SunEdison, including access to its project pipeline, and by our access to unaffiliated third party developers and owners of renewable energy assets in our core markets.

* * *

*Changes in Internal Control Over Financial Reporting*

There have been no changes in the Company's internal control over financial reporting … during the three months ended March 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

178.    The Q1 2015 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the Q1 2015 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over

58

financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

179.    On May 7, 2015, the Company filed a Prospectus Supplement No. 1 to the April 9, 2015 Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock.  The May 7, 2015 Prospectus Supplement incorporated the Q1 2015 10-Q and repeated the statements set forth in ¶¶ 176-178.

180.    On May 8, 2015, the Company filed a Current Report on Form 8-K signed by Defendant Hernandez stating that TERP was recasting certain financial information included in its 2014 10-K.  "The relevant financial information . . . is being recast to reflect the assets and liabilities and the results of operations of renewable energy facilities [TERP] acquired from its parent, [SunEdison], subsequent to the date of the [2014 10-K], for the period these facilities were owned by SunEdison…."  TERP "has revised . . . Item 15. Exhibits, Financial Statement Schedules.  The revised portion of the [2014 10-K] . . . is attached as Exhibit 99.  Exhibit 99 states, in part:

*Management Services Agreement*

Immediately prior to the completion of the IPO on July 23, 2014, [TERP] entered into the Management Services Agreement with SunEdison.  Pursuant to the Management Services Agreement, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax treasury, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

181.    On May 8, 2015, the Company filed a Prospectus Supplement No. 2 to the April 9, 2015 Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock.  The May 8, 2015 Prospectus Supplement incorporated the May 8, 2015 Current Report on Form 8-K and repeated the statements set forth in ¶ 180.

182.    The statements made by Defendants in ¶¶ 175-181 were false and/or misleading statements and/or failed to disclose: (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

**Second Quarter of 2015**

183.    On August 6, 2015, TERP issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 8-K").  For the quarter, TERP reported net income of $17.44 million, or $0.10 per diluted share, on revenue of $130.05 million, compared to revenue of $22.38 million for the same period in the prior year.  Defendant Domenech stated: "Our results were underpinned by . . . execution of drop down downs from SunEdison during the quarter."  "Our execution continues to deliver [cash available for distribution] and dividend growth to our shareholders."

184.    On August 6, 2015, TERP also filed a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2015 8-K

and reporting in full its financial and operating results for the quarter ended June 30, 2016 (the "Q2 2015 10-Q").

185.    In the Q2 2015 10-Q, TERP stated, in part:

*Management Services Agreement*

General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the Management Services Agreement ("MSA"). Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company and its subsidiaries.

* * *

We believe we are well-positioned for substantial growth due to. . . SunEdison's project origination and asset management capabilities.

* * *

Growth in our portfolio will be driven by our relationship with SunEdison, including access to its project pipeline, and by our access to unaffiliated third party developers and owners of renewable energy assets in our core markets.

* * *

*Changes in Internal Control Over Financial Reporting*

There have been no changes in the Company's internal control over financial reporting … during the three and six months ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

186.    The Q2 2015 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Domenech and Hernandez stating that the Q2 2015 10-Q did not contain any untrue statement of a material fact or omit to state a true fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading; that they are responsible for establishing and maintaining internal control over

61

financial reporting; that they designed the Company's internal control over financial reporting or caused internal control over financial reporting to be designed under their supervision; and disclosed any material changes to the Company's internal control over financial reporting.

187.    That day, TERP and SunEdison hosted a joint Earnings Conference Call for investors and analysts to discuss, in part, the results in the Q2 2015 10-Q.  As part of his prepared remarks, Defendant Hernandez stated, in part:

> In addition to our balance sheet liquidity we also benefit from incremental liquidity provided by the warehouse facilities we have placed in order with our sponsor SunEdison and our infrastructure partners…. In addition to maintaining significant balance sheet liquidity, the warehouses we have developed with SunEdison and our infrastructure partners provide another important tool to fund the growth with significant financial flexibility.

188.    On August 6, 2015, TERP also filed Prospectus Supplement No. 6 to the April 9, 2015 Prospectus with the SEC (Registration No. 333-202757) relating to the resale of Class A common stock, which incorporated the Q2 2015 10-Q and repeated the statements set forth in ¶¶ 184-186.

189.    The statements made by Defendants in ¶¶ 183-188 were false and/or misleading statements and/or failed to disclose: (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked

SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

### Third Quarter of 2015

190.   On November 9, 2015, TERP issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 8-K").  For the quarter, TERP reported a net loss of $820,000, or $0.03 per diluted share, on revenue of $163.29 million, compared to a net loss of $4.01 million, or $0.15 per diluted share, on revenue of $53.57 million for the same period in the prior year.

191.   On November 9, 2015, TERP filed a quarterly report on Form 10-Q with the SEC signed by Defendant Hernandez, reiterating the financial and operating results previously announced in the Q3 2015 8-K and reporting in full its financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").

192.   In the Q3 2015 10-Q, TERP stated, in part (emphasis added):

*Management Services Agreement*

General and administrative affiliate costs represent costs incurred by SunEdison for services provided to the Company pursuant to the Management Services Agreement ("MSA").  Pursuant to the MSA, SunEdison agreed to provide or arrange for other service providers to provide management and administrative services including legal, accounting, tax, treasury, project finance, information technology, insurance, employee benefit costs, communications, human resources, and procurement to the Company.

\*\*\*

*Changes in Internal Control Over Financial Reporting*

During the third quarter of 2015, we completed the implementation of a new global consolidation system that will enhance our consolidation processes, and we are in the process of implementing a new global enterprise resource planning system ("ERP") that will enhance our business and financial processes and standardize our information systems.  In October 2015, we substantially completed the ERP implementation with

respect to several operations and will continue to roll out the ERP in phases over the next several years. As with any new information systems we implement, these applications, along with the internal controls over financial reporting and consolidation included in these processes, will require testing for effectiveness. In connection with these implementations, we are updating our internal controls over financial reporting and consolidation, as necessary, to accommodate modifications to our business processes and accounting procedures. We do not believe that these implementations will have an adverse effect on our internal control over financial reporting or consolidation. Except as described above, there were no changes in SunEdison's internal control over financial reporting during the quarter ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

193.    The Q3 2015 10-Q contained signed certifications pursuant to Section 302 of

SOX by Defendants Domenech and Hernandez stating that the Q3 2015 10-Q did not contain

any untrue statement of a material fact or omit to state a true fact necessary to make the

statement made, in light of the circumstances under which such statements were made, not

misleading; that they are responsible for establishing and maintaining internal control over

financial reporting; that they designed the Company's internal control over financial reporting or

caused internal control over financial reporting to be designed under their supervision; and

disclosed any material changes to the Company's internal control over financial reporting.

194.    The statements made by Defendants in ¶¶ 190-193 were false and/or misleading

statements and/or failed to disclose that it was widely known within SunEdison and TERP that

SunEdison's internal control over financial reporting was woefully inadequate, and thus the

services provided to TERP pursuant to the Management Services Agreement rendered TERP's

internal control over financial reporting materially deficient and the Company incapable of

producing accurate financial statements.

**THE TRUTH GRADUALLY EMERGES**

195.    On October 5, 2015, SunEdison filed a Form 8-K with the SEC announcing

layoffs of 15% of its workforce and restructuring charges of $30 to $40 million for the third

quarter of 2015 through the first quarter of 2016.  The following day, the *Wall Street Journal* reported that SunEdison had failed to make a required $400 million upfront payment for a roughly $700 million planned acquisition.  A number of prominent hedge funds sold their SunEdison positions as analysts downgraded the stock.

196.    On November 9, 2015, after the close of markets, SunEdison filed a quarterly report on Form 10-Q with the SEC announcing its financial and operating results for the third quarter ended September 30, 2015 which revealed devastating facts about its debt and liquidity. SunEdison disclosed: (i) the terms of a Goldman Sachs loan, which contradicted its statements made in SunEdison's August 6, 2015 10-Q that the company's liquidity would be sufficient to support its operations for the next 12 months and that the company's available cash on hand would meet its capital needs for the remainder of 2015 as well as Defendant Wuebbels' statement made during an August 6, 2015 conference call with investors during which he stated that "we don't see any additional financings to be able to achieve this growth"; (ii) that it had been required to deposit an additional $91 million in cash collateral on the Margin Loan in October 2015; and (iii) that it had reclassified the $740 million of debt under the Margin Loan and Exchangeable Notes from non-recourse to recourse debt, thus giving its lenders access to more collateral.  This news concerning SunEdison's debt and liquidity, which significantly threatened TERP's growth strategy at the time, caused TERP's stock to plunge.

197.    On this news, TERP stock fell $3.87, or 21.15%, to close at $14.43 on November 10, 2015.

198.    On November 23, 2015, SunEdison filed a Form 8-K disclosing that, on November 20, 2015 Defendant Domenech, Executive Vice President of SunEdison and President and CEO of TERP and Global, was removed from his respective roles at TERP and Global and

terminated by SunEdison; and that Blackmore resigned as a director of SunEdison and was appointed to serve as a director of TERP and Global.

199.    On November 27, 2015, TERP filed a Form 8-K disclosing that, on November 20, 2015, SunEdison used its legal and contractual authority to: (i) appoint Blackmore and Jenkins-Stark as directors of TERP, whereupon the Board voted to expand itself and elect Compton as a director of TERP; (ii) appoint Blackmore as Chairman of TERP after the resignation of Chatila as Chairman of the Board; (iii) replace the existing TERP Corporate Governance and Conflicts Committee with Blackmore, Jenkins-Stark and Compton; (iv) terminate Defendant Domenech as TERP's President and CEO, terminate his employment with SunEdison, and remove him as a member of TERP's Board; (v) terminate Defendant Hernandez as TERP's Executive Vice President and CFO, and terminate his employment with SunEdison; and (vi) appoint Wuebbels as TERP's President and CEO and another SunEdison executive as TERP's interim CFO.  The November 27, 2015 Form 8-K further disclosed that: (vii) on November 22, 2015, Cranna was appointed to serve as TERP's Executive Vice President and CFO on a permanent basis; and (viii) Perez, Florian and Lerdal resigned from the Board as a result of their disagreement with the actions described above.  Prior to the meeting, Lerdal was the chairperson of the Corporate Governance and Conflicts Committee and a member of the Audit Committee of the Board.

200.    On February 29, 2016, SunEdison announced that it was delaying the filing of its fiscal year 2015 Form 10-K with the SEC, citing "(1) the need to complete all tasks and steps necessary to finalize the annual financial statements and the other disclosures required to be included in that filing, and (2) ongoing inquiries and investigations by the Audit Committee . . . relating to allegations concerning the accuracy of SunEdison's anticipated financial position." SunEdison stated that it expected to file its Form 10-K by March 15, 2016.

201.   On February 29, 2016, TERP also announced that it was delaying the filing of its

fiscal year 2015 Form 10-K with the SEC and also expected to file the Form 10-K by March 15,

2016.  Although Defendants knew more, TERP cited only "the need to complete all steps and

tasks necessary to finalize the Company's annual financial statements and other disclosures

required to be in the filing."

202.   On March 16, 2016, SunEdison announced a further delay in the filing of its Form

10-K beyond the extended due date of March 15, 2016, after material weaknesses in its internal

controls over financial reporting had been identified by management.

203.   On March 16, 2016, TERP also announced a further delay in the filing of its Form

10-K beyond the extended due date of March 15, 2016, and admitted that material weaknesses in

its internal control over financial reporting had been identified.  TERP stated, in part (emphasis

added):

> On February 29, 2016, TerraForm Power filed a Form 12b-25, Notification of Late
> Filing, with the Securities and Exchange Commission (the "SEC") regarding our delayed
> Form 10-K principally due to the need to complete all steps and tasks necessary to
> finalize our annual financial statements and other disclosures.  At that time, we expected
> that we would be able to file our Form 10-K within the 15-day extension period provided
> by Form 12b-25.
>
> On February 29, 2016, SunEdison ("SunEdison"), a Delaware corporation and our
> controlling shareholder, also filed a Form 12b-25, Notification of Late Filing, regarding
> the delayed filing of SunEdison's Annual Report on Form 10-K for the year ended
> December 31, 2015.  SunEdison announced that its delay in filing its Form 10-K was
> principally due to (1) the need to complete all tasks and steps necessary to finalize the
> annual financial statements and the other disclosures required to be included in that filing,
> and (2) ongoing inquiries and investigations by the Audit Committee of its Board of
> Directors and its advisors relating to allegations concerning the accuracy of SunEdison's
> anticipated financial position based on certain issues raised by former executives and
> current and former employees of SunEdison (the "SUNE-Related Matters").
>
> On March 16, 2016, SunEdison announced a further delay in filing its 10-K.  This delay
> is principally due to the additional scope of work required from the identification by
> SunEdison's management of material weaknesses in its internal controls over financial
> reporting, primarily due to deficient information technology controls in connection with

newly implemented systems (the "SUNE-Internal Control Matters").  Because of these material weaknesses, additional procedures are necessary for SunEdison's management to complete SunEdison's annual financial statements and related disclosures, and in order for SunEdison's independent registered accounting firm to finalize its audits as of December 31, 2015.  SunEdison also announced that they have not completed the SUNE-Related Matters, including the investigation described above.

Due to our management services arrangement with SunEdison under the Management Services Agreement, our financial reporting and control processes rely to a significant extent on SunEdison systems and personnel.  As a result, *if there are control deficiencies at SunEdison, including with respect to the systems we utilize, it is necessary for us to assess whether those deficiencies could affect our financial reporting* and, if so, address them to the extent necessary and appropriate prior to filing our Form 10-K.

SunEdison has informed us that they are continuing to work through the SUNE-Related matters and SUNE-Internal Control Matters and we have been assessing whether the SUNE-Related Matters and SUNE-Internal Control Matters could affect our financial statements.  To date, we have not identified any material misstatements or restatements of our audited or unaudited financial statements or disclosures for any period previously reported.

Additionally, we have not yet completed all steps and tasks necessary to finalize our financial statements and other required disclosures.  *We currently have identified material weaknesses in internal controls over financial reporting primarily due to ineffective controls in relation to our Enterprise Resource Planning (ERP) systems and processes for validating revenue recognition.*  We are working to remediate these issues as promptly as practicable.

As anticipated, because the filing of our Form 10-K will be delayed beyond the 15-day extension period of Form 12b-25, on March 15, 2016 we received a notification letter from a Director of NASDAQ Listing Qualifications.  The notification letter stated that because we have not yet filed our Form 10-K for the year ended December 31, 2015, TerraForm Power is no longer in compliance with NASDAQ Marketplace Rule 5250(c)(1), which requires timely filing of periodic reports with the SEC.

204.    On this news, TERP stock fell $0.83, or 7.87%, to close at $9.72 on March 16, 2016.

205.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered losses and damages in excess of $300 million.

## POST-CLASS PERIOD EVENTS

206.    On March 11, 2016, SunEdison announced that Wuebbels, its CFO, would resign and be replaced by incoming "chief financial officer designee" Ilan Daskal, effective upon his start with SunEdison, no later than April 4, 2016.  SunEdison stated that Wuebbels would remain SunEdison's CFO until Daskal and SunEdison agreed to remove the designee title, and Wuebbels would remain President and CEO of TERP and Global.

207.    On March 30, 2016, TERP announced that Wuebbels resigned from his position as President and CEO of the Company, and also resigned from his position as a director of the Board.

208.    On March 31, 2016, SunEdison disclosed in a Form 8-K filed with the SEC that it received a subpoena from the DOJ, and a nonpublic, informal inquiry from the SEC, seeking information and documentation relating to, *inter alia*, intercompany transactions involving SunEdison and each of TERP and Global; and the previously disclosed investigations by the company's audit committee.

209.    On April 14, 2016, SunEdison disclosed in a Form 8-K filed with the SEC that its audit committee, together with the aid of independent counsel and accounting and financial advisors, identified issues with SunEdison's overly optimistic culture and its tone at the top, and identified several specific issues regarding SunEdison's cash forecasting and liquidity management practices, including that: (i) SunEdison's cash forecasting efforts lacked sufficient controls and processes; (ii) certain assumptions underlying the cash forecasts provided to the Board by SunEdison's management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted; (iii) SunEdison's management had not responded appropriately when forecasted targets were not met; and (iv) SunEdison lacked sufficient controls and processes regarding its managing of cash flows, including extensions of

accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis.

210.    On April 18, 2016, a *Seeking Alpha* article stated that "[a]t the end of Mar-2016, SunEdison disclosed both a DOJ and SEC investigation.  This followed the company's delayed 10-K filing announced at the end of Feb-2016.  Yet information recently received from the SEC shows TERP Power, a 'yieldco' of SunEdison, was already under investigation by the SEC prior to either of these two events occurring at SunEdison.  To this day, the SEC investigation of TERP Power, which was confirmed as on-going as of 14-Mar-2016, remains undisclosed."

211.    On April 21, 2016, SunEdison and 25 affiliated entities filed bankruptcy petitions in the Bankruptcy Court for the Southern District of New York.  TERP did not file for bankruptcy.

212.    On May 10, 2016, SunEdison terminated Wuebbels.  His last day of employment was June 9, 2016.

213.    On May 11, 2016, TERP filed a Form 12b-25, Notification of Late Filing, with the SEC regarding its delayed 10-Q for the quarter ended March 31, 2016.  The Company stated that it had also not yet filed its 10-K for the year ended December 31, 2015 and admitted that its internal control over financial reporting suffered from additional material undisclosed weaknesses.  TERP stated, in part (emphasis added):

> As the Company has previously disclosed, due to the services we receive from SunEdison . . . under the Management Services Agreement, our financial reporting and control processes rely to a significant extent on SunEdison systems and personnel.  As a result, if there are control deficiencies at SunEdison, including with respect to the systems that we utilize, it is necessary for us to assess whether those deficiencies could affect our financial reporting and related internal controls, and, if so, assess whether matters related to SunEdison's delay in its Form 10-K (including (a) SunEdison's identification of material weaknesses and additional procedures necessary to complete its annual financial statements and related disclosures and (b) the publicly disclosed findings of the

investigation by SunEdison's independent directors and the related remedial plan) could affect our financial reporting and related internal controls.

***We currently have identified material weaknesses in internal control over financial reporting primarily due to (i) ineffective controls in relation to our Enterprise Resource Planning (ERP) systems, (ii) processes for validating revenue recognition, (iii) processing of accounts payable and general and administrative expenses, (iv) valuation of costs of projects acquired from SunEdison, and (v) controls over account reconciliations and restricted cash classifications.***

214.    On May 12, 2016, SunEdison filed a Form 12b-25, Notification of Late Filing, with the SEC regarding its delayed 10-Q for the quarter ended March 31, 2016. SunEdison stated that it also had not yet filed its 10-K for the year ended December 31, 2015. SunEdison stated, in part:

> The Form 10-K continues to be delayed due to the previously disclosed identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems. Because of these material weaknesses, additional procedures are necessary for management to complete the Company's annual financial statements and related disclosures, and for the finalization of the audit of the Company's annual financial statements and the effectiveness of internal controls over financial reporting as of December 31, 2015.

215.    In an Order dated August 11, 2016, the Bankruptcy Court stated: "filings on the Petition Date and thereafter also raised serious questions regarding SunEdison's financial condition and the reliability of previously published financial data. According to Patrick M. Cook, SunEdison's Vice President-Capital Markets and Corporate Finance, the SunEdison Group owed secured and unsecured funded debt in the amount of $3.832 billion and trade debt of at least $357 million. Cook also reported falling stock prices for SunEdison and the Yieldcos, recounted the details of litigation against SunEdison and repeated the issues relating to the financial statements discussed in the Forms 8-K, including the DOJ Investigation."

216.    On December 5, 2016, TERP finally filed its Form 10-K for the year ended December 31, 2015. Pursuant to Section 404 of SOX, TERP'S management reported that as of

71

December 31, 2015, the Company did not maintain an effective control environment attributed to certain identified material weaknesses.  The Company stated:

> *Management's Report on Internal Control over Financial Reporting*
>
> \* \* \*
>
> As of December 31, 2015, management conducted an assessment of the effectiveness of our internal control over financial reporting based upon the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control-Integrated Framework (2013)* (COSO 2013 Framework). Based on management's assessment using these criteria, our management concluded that, as of December 31, 2015, our internal control over financial reporting was not effective as further described below.
>
> \* \* \*
>
> The Company, and SunEdison as our service provider for all matters related to financial reporting processes and controls, did not maintain an effective control environment, risk assessment process, information and communication process and monitoring activities based on the following:
>
> •  The Company did not have effective Board oversight and management monitoring activities over the information technology system development and implementation of financial reporting processes and internal controls established by the parent company service provider;
>
> •  The Company did not have a sufficient number of trained resources with assigned responsibility and accountability for financial reporting processes and the design and effective operation of internal controls conducted by the parent company service provider;
>
> •  The Company did not have an effective risk assessment process that identified and assessed necessary changes in generally accepted accounting principles, financial reporting processes and internal controls, in response to risks of fraud and error impacted by changes in the business model resulting from rapid growth from acquisitions, changes in information systems, changes at SunEdison, and transition of key personnel;
>
> •  The Company did not have effective information and communication processes that ensured appropriate and accurate information was available to financial reporting personnel on a timely basis in order that they could fulfill their roles and responsibilities; and
>
> •  The Company did not have effective monitoring activities in place to assess whether the components of internal control were present and functioning.

Accordingly, the Company, and SunEdison as our service provider for all matters related to financial reporting processes and controls, did not have effective control activities over the following:

• The Company did not have effective general information technology controls (GITCs), specifically, system development, program change, and access GITCs over the consolidation and Solar segment operating systems, databases, and IT applications. Also, the Company did not have effective access controls over the Wind Segment operating system.

• The Company did not have effective controls over the completeness, existence, and accuracy of revenues, specifically, process level controls over the price and quantity inputs to revenue and accounts receivable transactions were not adequately designed and performed.

• The Company did not have effective operation of reconciliation controls over the completeness, existence and accuracy of various balance sheet accounts. Specifically, the reconciliation controls did not adequately investigate, resolve and correct reconciling items on a timely basis.

• The Company did not have effective controls over the completeness, existence and accuracy of allocated general and administrative expenses including payroll and other costs shared with SunEdison.

• The Company did not have effective controls over the completeness, existence and accuracy of the transfer of historical costs related to renewable energy facilities acquired from SunEdison.

• The Company did not have effective controls over the completeness and presentation of restricted cash. Specifically, the Company's policies and procedures to record restricted cash were not applied consistently across accounts.

• The Company did not have effective controls over the completeness and accuracy of information used in goodwill impairment, business combinations, hypothetical liquidation of book value, debt covenant compliance and going concern processes.

These control deficiencies resulted in several material misstatements to the preliminary consolidated financial statements that were corrected prior to the issuance of the audited consolidated financial statements. These control deficiencies create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis, and therefore we concluded that the deficiencies represent material weaknesses in the Company's internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2015.

Our independent registered public accounting firm, KPMG, LLP, who audited the consolidated financial statements included in this annual report, has expressed an adverse report on the operating effectiveness of the Company's internal control over financial reporting. . . .

*Changes in Internal Control Over Financial Reporting*

During the fourth quarter of 2015, SunEdison, our financial reporting and internal control service provider, completed the implementation of a new ERP system used to process our financial transactions. SunEdison performed testing of effectiveness of internal controls over financial reporting in regards to this ERP system and a new global consolidation system that was implemented during the third quarter. Completion of this testing identified the material weakness of internal controls described above in relation to the general information and technology controls over the ERP system and the consolidation system. Except for the material weaknesses described above, there were no other changes in our internal control over financial reporting identified during the quarter or year ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

217.    The 10-K also included KPMG LLP's December 5, 2016 audit report that stated

that with respect to TERP's internal control over financial reporting as of December 31, 2015,

the following material weaknesses had been found:

• Ineffective Board oversight and management monitoring activities over the information technology systems development and implementation of financial reporting processes and internal controls by the parent company service provider;

• Insufficient number of trained resources with assigned responsibility and accountability for financial reporting processes and internal controls conducted by the parent company service provider;

• Ineffective risk assessment process that responds to changes in generally accepted accounting principles, changes in its business operations, modifications to information technology systems, and changes within the parent company service provider and key personnel;

• Ineffective information and communication processes that ensure appropriate and accurate information is available to financial reporting personnel on a timely basis;

• Ineffective monitoring activities;

• Ineffective general information technology controls over the consolidation and Solar segment operating systems, databases, and IT applications and ineffective access controls over the Wind Segment operating system, databases, and IT applications, both resulting

in ineffective process level automated controls and compensating manual controls dependent upon the information derived from relevant IT systems;

• Ineffective controls over the completeness, existence, and accuracy of: (i) revenues and accounts receivable transactions (ii) allocated general and administrative expenses, (iii) the transfer of historical costs related to renewable energy facilities acquired from the parent company;

• Ineffective operation of reconciliation controls over the completeness, existence and accuracy of various balance sheet accounts;

• Ineffective controls over the completeness and presentation of restricted cash; and

• Ineffective controls over the completeness and accuracy of information used as part of goodwill impairment, business combinations, hypothetical liquidation of book value, debt covenant compliance, and going concern processes.

218.    On December 6, 2016, TERP filed its Form 10-Q for the period ended March 31,

2016.  TERP stated the following, in part:

As disclosed in our annual report on Form 10-K for the year ended December 31, 2015, management identified material weaknesses in the Company's internal control over financial reporting. We carried out an evaluation as of March 31, 2016, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were ineffective as of March 31, 2016 due to previously identified material weaknesses, which continued to exist as of March 31, 2016.

219.    On February 7, 2017 and February 24, 2017, TERP filed its Form 10-Q for the

periods ended June 30, 2016 and September 30, 2016, respectively.  Management concluded that

TERP's disclosure control and procedures were ineffective as of June 30, 2016 and September

30, 2016, respectively, due to previously identified material weaknesses, which continued to

exist on those dates.

**LOSS CAUSATION**

220.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

Plaintiffs and the Class to suffer substantial losses.  During the Class Period, Plaintiffs and the

Class purchased TERP common stock at artificially inflated prices, and were damaged thereby when the price of TERP common stock significantly declined, causing investors to suffer losses when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by Defendants materialized.

221.   Specifically, the statements made by Defendants were false and/or misleading and/or failed to disclose information that they knew or recklessly disregarded, including: (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.  When those statements were corrected and the risks concealed by them materialized, investors suffered losses as the price of TERP common stock declined.  As a result of the disclosure of the truth of Defendants' fraud, the price of TERP's common stock declined as follows:

(a) $3.87, or 21.15%, from a closing price of $18.30 per share on November 9, 2015 to a closing price of $14.43 per share on November 10, 2015; and

(b) $0.83, or 7.87%, from a closing price of $10.55 per share on March 15, 2016 to a closing price of $9.72 per share on March 16, 2016.

222.   The disclosures that corrected the market price of TERP's common stock to reduce the artificial inflation caused by Defendants' materially false and misleading statements and omissions occurred on:

(a) November 9, 2015 when SunEdison disclosed: (i) the terms of a Goldman Sachs loan, which contradicted its statements made in SunEdison's August 6, 2015 10-Q that the company's liquidity would be sufficient to support its operations for the next 12 months and that the company's available cash on hand would meet its capital needs for the remainder of 2015 as well as Defendant Wuebbels' statement made during an August 6, 2015 conference call with investors during which he stated that "we don't see any additional financings to be able to achieve this growth"; (ii) that it had been required to deposit an additional $91 million in cash collateral on the Margin Loan in October 2015; and (iii) that it had reclassified the $740 million of debt under the Margin Loan and Exchangeable Notes from non-recourse to recourse debt.

(b) March 16, 2016 when TERP announced: (i) that it would further delay the filing of its Form 10-K for the year ended December 31, 2015 beyond the extended due date of March 15, 2016; (ii) that SunEdison announced a further delay in filing its Form 10-K for the year ended December 31, 2015 principally due to the additional scope of work required from the identification of material weaknesses in its internal controls over financial reporting; (iii) that due to TERP's Management Services Agreement with SunEdison, if there are control deficiencies at SunEdison, including with respect to the systems TERP utilizes, it is necessary for TERP to assess whether those deficiencies could affect TERP's financial reporting; (iv) that TERP has identified material weaknesses in internal controls over financial reporting; and (v) that because the filing of TERP's Form 10-K would be further delayed, TERP received a notification letter on March 15, 2016 from NASDAQ Listing Qualifications stating that TERP is no longer in compliance with NASDAQ Marketplace Rule 5250(c)(1) which requires timely filing of periodic reports with the SEC.

223.   Accordingly, as a result of their purchases of TERP's publicly traded common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

224.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TERP common stock during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are

Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

225.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TERP common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by TERP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

226.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

227.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

228.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the Company's internal control over financial reporting;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts regarding the Company's growth strategy at that time;

- whether Defendants caused TERP to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of TERP common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

229.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

230.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- TERP common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts. Their reports were publicly available and entered the public marketplace;

- TERP was eligible to file registration statements with the SEC on Form S-3ASR;

- Defendants regularly communicated with public investors by means of established market communication mechanisms, including through dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold TERP common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

231.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

232.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>**COUNT I**</u>

**(Against All Defendants for Violations of Section 10(b)**
**<u>and Rule 10b-5 Promulgated Thereunder)</u>**

233.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

234.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

235.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TERP common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire TERP common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

236.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for TERP securities.  Such reports, filings, releases and statements were materially false and misleading in that they misrepresented the truth and failed to disclose material adverse information which they knew or recklessly disregarded – (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting

materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

237.    By virtue of their positions at TERP, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.   Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.   In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

238.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.   As senior executive officers and directors of TERP, Defendants had knowledge of the details of TERP's internal affairs.

239.    Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of TERP.   As senior executive officers

and directors of a publicly-held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TERP's business, operations, finances and internal control over financial reporting.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TERP common stock was artificially inflated throughout the Class Period.  In ignorance of the aforementioned adverse information stated above which was concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired TERP common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

240.     During the Class Period, TERP common stock was traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TERP common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of TERP common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of TERP common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

241.     By reason of the conduct alleged herein, Defendants knowingly or recklessly have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

242.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating materially false and/or misleading statements, and/or failed to disclose information that they knew or recklessly disregarded, including:  (i) that it was widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity which caused significant risk to TERP's growth strategy at that time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

## <u>COUNT II</u>

### <u>(Violations of Section 20(a) of the Exchange Act<br>Against Chatila, Wuebbels, Domenech, Hernandez and Perez</u>

243.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

244.     During the Class Period, Defendants Chatila, Wuebbels, Domenech, Hernandez, and Perez participated in the operation and management of TERP, and conducted and participated, directly and indirectly, in the conduct of TERP's business affairs.  Because of their positions, they knew or recklessly disregarded the adverse non-public information:  (i) that it was

widely known within SunEdison and TERP that SunEdison's internal control over financial reporting was woefully inadequate, and thus the services provided to TERP pursuant to the Management Services Agreement rendered TERP's internal control over financial reporting materially deficient and the Company incapable of producing accurate financial statements; (ii) that SunEdison, its parent company and controlling shareholder, on which TERP was admittedly dependent on for drop down acquisitions, was misrepresenting and omitting material facts concerning its debt and liquidity which caused significant risk to TERP's growth strategy at the time; and (iii) that SunEdison forced TERP to pay for expenses and prepayments that TERP was not obligated to pay which further masked SunEdison's liquidity problems and caused significant risk to TERP's growth strategy at that time.

245.     Defendants Chatila, Wuebbels, Domenech, Hernandez and Perez each had a duty to disseminate accurate and truthful information with respect to TERP's business, operations, internal control over financial reporting, and financial condition, and to correct promptly any public statements issued by TERP which had become materially false or misleading.

246.     Because of their positions of control and authority, Defendants Chatila, Wuebbels, Domenech, Hernandez, and Perez were able to, and did, control the contents of the various reports, press releases and public filings which TERP disseminated in the marketplace during the Class Period concerning TERP's business, operations, internal control over financial reporting, and financial condition.  Throughout the Class Period, such Defendants exercised their power and authority to cause TERP to engage in the wrongful acts complained of herein. Defendants Chatila, Wuebbels, Domenech, Hernandez, and Perez therefore were "controlling persons" of TERP within the meaning of Section 20(a) of the Exchange Act.  In this capacity,

they participated in the unlawful conduct alleged which artificially inflated the market price of TERP securities.

247.     Each of the Defendants Chatila, Wuebbels, Domenech, Hernandez and Perez therefore acted as a controlling person of TERP.  By reason of their positions at TERP, each of them had the power to direct the actions of, and exercised the same to cause, TERP to engage in the unlawful acts and conduct complained of herein.  Each of them exercised control over the general operations of TERP and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

248.     By reason of the above conduct, Defendants Chatila, Wuebbels, Domenech, Hernandez and Perez are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TERP.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  March 24, 2017

By: */s/Jeremy A. Lieberman*

**POMERANTZ LLP**
Jeremy A. Lieberman
Brenda Szydlo
Jennifer Banner Sobers
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
　　　 bszydlo@pomlaw.com
　　　 jbsobers@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Additional Counsel*:

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
　　　 pkim@rosenlegal.com
　　　 sfuks@rosenlegal.com

*Attorneys for Plaintiffs and the Proposed Class*

87